**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

| | |
|---|---|
| TENNESSEE STATE CONFERENCE OF THE NAACP; LEAGUE OF WOMEN VOTERS OF TENNESSEE; THE EQUITY ALLIANCE; MEMPHIS A. PHILIP RANDOLPH INSTITUTE; AFRICAN AMERICAN CLERGY COLLECTIVE OF TENNESSEE; JUDY CUMMINGS; BRENDA GILMORE; OPHELIA DOE; FREDA PLAYER; and RUBY POWELL-DENNIS, <br><br> Plaintiffs, <br><br> v. <br><br> WILLIAM B. LEE, in his official capacity as Governor of the State of Tennessee; TRE HARGETT, in his official capacity as Secretary of State of the State of Tennessee, MARK GOINS, in his official capacity as Coordinator of Elections for the State of Tennessee; the STATE ELECTION COMMISSION, and DONNA BARRETT, JUDY BLACKBURN, JIMMY ELDRIDGE, MIKE MCDONALD, SECONDRA MEADOWS, BENNIE SMITH, and KENT YOUNCE, in their official capacities as members of the State Election Commission, <br><br> Defendants. | Civil Action File No. <br><br> **Requesting a three-judge panel pursuant to 28 U.S.C. § 2284** |

## COMPLAINT

Plaintiffs Tennessee State Conference of the NAACP, League of Women Voters of Tennessee, The Equity Alliance, Memphis A. Philip Randolph Institute, African American Clergy Collective of Tennessee, Judy Cummings, Brenda Gilmore, Ophelia Doe, Freda Player, and Ruby Powell-Dennis (collectively, "Plaintiffs") bring this action against William B. Lee, in his official capacity as Governor of the State of Tennessee; Tre Hargett, in his official capacity as Secretary

1

of State of the State of Tennessee; Mark Goins, in his official capacity as Coordinator of Elections for the State of Tennessee; the State Election Commission; and Donna Barrett, Judy Blackburn, Jimmy Eldridge, Mike McDonald, Secondra Meadows, Bennie Smith, and Kent Younce, in their official capacities as members of the State Election Commission (collectively, "Defendants"), and allege as follows:

## INTRODUCTION

1.      The 112th Tennessee Legislature's redistricting plans for the state's Congressional and State Senate districts makes unlawful use of race and subordinates traditional redistricting principles to race, thus violating the Fourteenth and Fifteenth Amendment rights of Black voters and other voters of color.

2.      In particular, the newly drawn districts in Davidson and Shelby Counties dilute the votes of Black voters and other voters of color by "cracking" and "packing" these communities to minimize their electoral voices.

3.      The Tennessee Legislature was well aware that its proposed redistricting changes in Davidson and Shelby Counties would dilute the votes of and adversely impact Black voters and other voters of color in those counties.

4.      Prior to the redistricting, all of Davidson County—home to Nashville—was contained within Congressional District ("CD") 5.  Numerous civil rights groups, including several of the Plaintiffs in this action, testified before the Tennessee Legislature to the importance of keeping all of Davidson County within a single district to ensure that Black voters and other voters of color could continue to exercise their influence and elect candidates of their choice.  But the Legislature disregarded that testimony, instead forging ahead with its plan to splinter Davidson County and the city of Nashville into three separate Congressional Districts—CD-5, CD-6, and

2

CD-7. The resulting map splintered the electoral strength of Black voters and other voters of color in Davidson County, just as the Legislature intended.

5.     Like Davidson County, Shelby County is home to historically Black communities. Civil rights groups, including several Plaintiffs in this action, testified that as part of the redistricting, the Legislature should keep those communities whole. The Legislature ignored them, divvying up cohesive neighborhoods and communities of interest between different legislative districts and diluting the voting power of Black citizens and other persons of color. In doing so, the Legislature subordinated traditional redistricting principles—such as compactness, the maintenance of communities of interest, and respect for political subdivisions—to race. Because of this new map, voters of color in SD-31 no longer have an opportunity to elect their candidates of choice.

6.     The two plans challenged here—Tennessee's Congressional and State Senate Plans—passed in Tennessee's respective House and Senate committees very quickly and without much debate or meaningful discussion. On January 20, Congressional and State Senate maps were introduced and considered on the Senate floor, put to a vote, and passed—all in a little over an hour. On January 24, those same maps were introduced on the House floor, voted on, and passed again, in a quick fashion.

7.     Members of the House and Senate committees that considered and approved the redrawn maps were overwhelmingly white. Rather than engage in a bona fide discussion regarding a fair and equitable redistricting plan, the committees implemented an opaque, inadequate, and rushed process designed to forestall public scrutiny, minimize backlash, and stifle any meaningful debate or dissent.

8.     The plan worked as intended.  Despite calls for greater transparency and more opportunities for public comment, members of the public including representatives of civil rights organizations who sought to testify were given almost no opportunity to comment publicly on any of the proposed maps submitted by members of the committee.  The House did not have any public comment on the Congressional and State Senate maps (HB 1034 and HB 1037) after those maps were formally introduced on January 12, 2022.  The Senate only allowed public comment regarding the State Senate and Congressional plans (SB 780 and SB 781) in the Senate Judiciary Committee on January 18, 2022, after the maps were introduced on January 13, 2022, with no corresponding demographic data.

9.     The full Legislature did no better.  Upon their emergence from committee, the Congressional and State Senate plans were both passed hastily, without any meaningful consideration given to public testimony against the plans or to several proposed amendments that might have alleviated the impact of the discriminatory intent animating the plans—including several amendments introduced by Black legislators.

10.     In light of the foregoing and below, Plaintiffs seek declaratory relief and a permanent injunction that prohibits Defendants from calling, holding, supervising, or certifying any further election in the challenged districts under the redistricting plans passed by the 112th General Assembly.  Further, Plaintiffs respectfully request that the Court order Defendants to cure the impermissible intentional vote dilution and racial gerrymander evident in the newly drawn Congressional Districts CD-5, CD-6, and CD-7 in Davidson County and the impermissible intentional vote dilution and racial gerrymander evident in the drawing of State Senate District SD-31 in Shelby County.

4

## JURISDICTION AND VENUE

11.    Jurisdiction is appropriate under 28 U.S.C. § 1331.  Plaintiffs' claims arise "under the Constitution, laws, or treaties of the United States," including the Fourteenth and Fifteenth Amendments to the United States Constitution, 28 U.S.C. §§ 2201 and 2202, 42 U.S.C. § 1983, and 42 U.S.C. § 1988.

12.    Jurisdiction is also appropriate under 28 U.S.C. § 1343 because Plaintiffs seek to "redress deprivation" of a "privilege or immunity secured by the Constitution of the United States" and seek "equitable relief . . . under [an] Act of Congress providing for the protection of civil rights, including the right to vote."

13.    Venue in this Court is appropriate under 28 U.S.C. § 1391(b) because Plaintiffs' members' voting rights are being infringed upon in this District and in this County.

## REQUEST FOR THREE-JUDGE PANEL

14.    Because this action challenges the constitutionality of the apportionment of a statewide legislative body, as well as the apportionment of a state's Congressional delegation, Plaintiff respectfully requests the convening of a three-judge panel pursuant to 28 U.S.C. § 2284.

## PARTIES

### A.  The Plaintiffs

15.    Plaintiff **TENNESSEE STATE CONFERENCE OF THE NAACP** ("Tennessee NAACP") is a subsidiary organization of the National Association for the Advancement of Colored People, Inc. ("NAACP"), a national non-profit, non-partisan organization founded in 1909, which has more than 2,200 units across the nation and is powered by more than two million activists.  The NAACP works to ensure the political, educational, social, and economic equality of all persons and to eliminate racial hatred and racial discrimination, including by removing all barriers of racial discrimination through democratic processes.

5

16.     The Tennessee NAACP is a nonpartisan, multi-racial, non-profit membership-based organization headquartered in Jackson, Tennessee, and is the state's chapter of the largest and most preeminent civil rights organization in the country.  The Tennessee NAACP was founded in 1946 to serve as the Tennessee arm of the NAACP.  Its mission is to eliminate race-based discrimination through securing political, educational, social, and economic equality rights and ensuring the health and well-being of all persons.

17.     The Tennessee NAACP has three regional divisions—Eastern, Middle, and Western Tennessee—as well as 31 local branch units and 17 college chapters and youth councils. The Tennessee NAACP and most of its local branch units are primarily volunteer-run, and all officers are volunteers.  In total, the Tennessee NAACP has more than 10,000 members across the state.  The Tennessee NAACP's membership is predominantly Black, but the organization also has members from the Hispanic community and other communities of color.  Many Black members are residents and registered voters in the challenged districts in Davidson and Shelby Counties.

18.     The Tennessee NAACP has a history of fighting for fair and equitable maps, as well as advocating for responsive government, specifically in Davidson and Shelby Counties.

19.     During the 112th General Assembly when the 2021 redistricting plans were passed, the Tennessee NAACP gave public testimony before both the Senate and House redistricting committees, submitted a Congressional concept map to the House redistricting committee in conjunction with the League of Women Voters of Tennessee and Civic Tennessee, and held its own set of public comment events across Tennessee in conjunction with other civic organizations and the Legislative Black Caucus.  Based on the feedback received at these public events, the Tennessee NAACP presented a report to the House and Senate redistricting subcommittees that

6

emphasized, among other things, the importance of redistricting in a manner that keeps communities of interest together and does not dilute the voting power of Black voters and other voters of color.

20.     The Tennessee NAACP brings this case on behalf of its members, including Black members, Hispanic members, and other members of color who are registered voters and reside in each of the challenged districts in Davidson County (CD-5, CD-6, and CD-7) and Shelby County (SD-31), whose voting power has been reduced given the configuration of the districts in those counties.

21.     The **LEAGUE OF WOMEN VOTERS OF TENNESSEE** ("LWVTN" or "the League") is a non-partisan, non-profit, grassroots, membership-based organization. LWVTN seeks to promote civic engagement through informed and active participation in government. It accomplishes this mission in part by helping Tennessee citizens register to vote, educating voters about the issues that impact them, and encouraging voters to be active participants in democracy through engaging with elected officials and their policy decisions. Additionally, LWVTN focuses on racial equity in voting and believes it is important that voters have a reasonable opportunity to elect their candidates of choice.

22.     LWVTN is part of the League of Women Voters of the United States and has over 1,000 members statewide, spread out amongst various local Leagues across Tennessee, including communities of color in each of the challenged districts in Davidson and Shelby Counties.

23.     During the 112th General Assembly when the 2021 redistricting plans were passed, LWVTN was active, with the President of LWVTN testifying before both the House and Senate redistricting committees on the impact that the proposed House, Senate, and Congressional plans would have on Tennessee voters, specifically Black voters and other voters of color. LWVTN

7

also submitted a Congressional concept map to the House redistricting committee, and in conjunction with the Tennessee NAACP and Civic Tennessee, held three public redistricting events in late 2021 where community members were able to provide their thoughts about the proposed plans. After these public events, the comments were compiled and distributed to both the House and Senate redistricting committees.

24.     LWVTN brings this case on behalf of its members, which include registered Black, Hispanic, and other voters of color who reside in each of the challenged districts in Davidson County (CD-5, CD-6, and CD-7) and Shelby County (SD-31), whose voting power has been reduced given the configuration of the districts in these counties.

25.     Plaintiff **THE EQUITY ALLIANCE** ("Equity Alliance") is a non-partisan, non-profit Nashville, Tennessee based organization, with staff also located in Memphis and Chattanooga. Equity Alliance was founded to improve the quality of life for Black Tennesseans, focusing on three core pillars of Democracy, Growth, and Power. Equity Alliance's mission centers upon educating, empowering, and mobilizing Black people to take action and to hold government accountable. Equity Alliance strives to accomplish its mission by encouraging the Black electorate to be civically engaged, to challenge systemic inequities, and to stand up against attacks on democracy.

26.     Equity Alliance promotes democracy through robust voter registration and voter education efforts, with the goal of robust Black participation in the Tennessee electoral process and continued voter engagement. Equity Alliance also works to sustain relationships with elected officials with the aim of electing people who will be responsive to the needs of the communities in which they serve.

8

27.     During the 112th General Assembly when the redistricting plans were passed, Equity Alliance leaders publicly testified about the importance of fair and equitable redistricting plans, with specific respect to Middle Tennessee.  Equity Alliance also submitted House, Senate, and Congressional maps on behalf of itself and the Memphis A. Philip Randolph Institute that did not dilute the voting power of Black voters and other voters of color.  Further, Equity Alliance organized a protest against the enacted plans, spoke with Legislators about the proposed maps, and held community town halls across Tennessee in an effort to encourage Black voters and other voters of color to advocate for better maps.

28.     Equity Alliance has diverted and continues to divert resources away from its voter registration and other election protection activities, in order to advocate against the passage of the enacted maps because of the harmful effects that they would have on Black voters and other voters of color, including in the challenged districts.  This diversion of resources will continue now that the maps have passed, and Equity Alliance will have to commit significant time and resources to combatting the effects of these new maps on communities of color throughout the state, including communities of color in the challenged districts.  Additionally, Equity Alliance will have to expend resources educating voters about what districts they are now in, and it will have to expend extra resources to build new coalitions with voters who have not historically been in the same Congressional or state legislative districts.  By allocating time and resources to these priorities, Equity Alliance will be unable to commit to other programs that are core to its mission such as election protection and voter engagement efforts.  Had the Tennessee Legislature not dismantled CD-5 and SD-31, Equity Alliance would not have needed to divert resources in the past or continue to do so in the future to combat the dilutive effects of the redistricting plans through, among other things, coalition-building and voter education in the challenged districts.

29.     Plaintiff **MEMPHIS A. PHILIP RANDOLPH INSTITUTE** ("MAPRI") is a non-partisan, non-profit Memphis, Tennessee-based political advocacy and membership-based organization that works to strengthen ties between the labor movement and the community, increase the political impact of Black voters, and implement structural changes through the democratic process. In support of its advocacy and engagement efforts, MAPRI sponsors voter education and Get-Out-the-Vote programs in the community. MAPRI has advocated for fair maps, an equitable redistricting process, and responsive government for many years. MAPRI's members are predominantly Black but also hail from other communities of color, including the Hispanic community.

30.     During this redistricting cycle, MAPRI remained very involved in the redistricting process. MAPRI's Executive Director Kermit Moore spoke at a legislative public hearing in Memphis. MAPRI is also a part of the Shelby County Voter Alliance, a group of non-profit, non-partisan organizations that advocate for racial equity and voting rights and sponsored a number of events relating to the proposed redistricting. MAPRI presented House, Senate, and Congressional concept electoral maps to the Legislature on behalf of itself and other coalition groups, including co-plaintiff Equity Alliance.

31.     MAPRI brings this case on behalf of those of its members who are registered voters, including Black voters, who reside in the Shelby County State Senate district (SD-31), and whose voting power will be reduced given the new configuration of that district.

32.     The **AFRICAN AMERICAN CLERGY COLLECTIVE OF TENNESSEE** ("ACCT") is a Nashville, Tennessee non-partisan membership-based organization founded to galvanize the voices of Black churches and Black people in Tennessee through various means. ACCT focuses on civic engagement, and also focuses on education, criminal justice reform,

10

economic empowerment, and healthcare. ACCT has both organizational and individual members, including members in Davidson and Shelby Counties. ACCT's members are predominantly Black.

33.     ACCT became involved in this redistricting cycle because the organization had concerns about Black vote dilution across Tennessee, and specifically in Davidson and Shelby Counties. Among other things, it has written to the House Select Committee on Redistricting regarding its concerns about the redistricting process, met with a number of elected members of the Tennessee Legislature, and participated in press conferences and a prayer vigil related to the redistricting process.

34.     ACCT brings this case on behalf of its members who are Black, registered voters, and who reside in Davidson County (CD-5 and CD-7), and Shelby County (SD-31), whose voting power will be reduced given the configuration of the districts in these counties.

35.     Plaintiff **JUDY CUMMINGS** resides in the newly drawn CD-7, in Nashville. Dr. Cummings identifies as Black, is a United States citizen and a registered voter, and votes regularly. Dr. Cummings has lived in Nashville since 1975 and has voted in Nashville for nearly 50 years. She is an active member in several civic engagement groups that work on voter education, voter registration, and gun policy issues and engage in other social justice initiatives. She is a member of the ACCT and a lifetime member of the Tennessee NAACP, where she also serves on the Organization's executive board as the religious affairs coordinator. Dr. Cummings serves on the board of Forward Tennessee, a civic engagement organization, is a member of the Southern Christian Coalition, and is a member of the Metro Nashville Chapter of the Delta Sigma Theta Sorority.

36.     Under the old plan, which kept all of Davidson County and Nashville within one district, Dr. Cummings was in CD-5 and was able to elect her candidate of choice.  Under the new plan, Dr. Cummings finds herself in CD-7, which brings in voters from white rural counties who have social, cultural, policy, and community-oriented concerns different from that of Dr. Cummings and her community.

37.     Plaintiff **BRENDA GILMORE** resides in the newly drawn CD-7, in Nashville. Ms. Gilmore identifies as African American, is a United States citizen, is registered to vote, and votes regularly.  Ms. Gilmore served as a Nashville Metro Council Member representing District 1 from 1999 to 2006.  From 2006 to 2018, Ms. Gilmore represented state House District 54 in Nashville.  Before retiring in 2022, Ms. Gilmore represented State Senate District 19, from 2018 to 2022—which encompassed, in part, urban and diverse communities of Nashville.  Ms. Gilmore is active in a number of civic engagement groups that engage in voter education and registration in Nashville.  She is a member of the executive board of the Tennessee NAACP, a member of the executive board of the Nashville Branch of the Tennessee NAACP, and a member of the League of Women Voters of Nashville and the LWVTN.  She is a member of the Delta Sigma Theta Sorority ("DST"), serving on the National Social Action Commission and serving as a Liaison for the Southern Region of DST.

38.     Under the old plan, which kept all of Davidson County and Nashville within one district, Ms. Gilmore was in CD-5 and was able to elect her candidate of choice.  Under the new plan, Ms. Gilmore finds herself in CD-7, which brings in voters from white, rural counties who have social, cultural, policy, and community-oriented concerns different from that of Ms. Gilmore and her community.

39. Plaintiff **OPHELIA DOE** lives in the newly drawn CD-5, in Nashville. Ms. Doe identifies as Black and Filipino, is a United States citizen and a registered voter, and votes regularly. She has voted in Tennessee elections since 2016 when she moved to Davidson County. Since 2020, Ms. Doe has served on the board of the League of Women Voters of Nashville and is a member of the LWVTN. She is also a member of the Junior League of Nashville, Leadership Healthcare, and the Nashville Healthcare Privacy Network.

40. Under the old plan, which kept all of Davidson County and Nashville within one district, Ms. Doe was in CD-5 and was able to elect her candidate of choice. Under the new plan, Ms. Doe finds herself in a completely reconfigured CD-5, which brings in voters from white rural counties who have social, cultural, policy, and community-oriented concerns different from that of Ms. Doe and her community.

41. Plaintiff **FREDA PLAYER** lives in newly drawn CD-6, in Nashville. Ms. Player identifies as Black, is a United States citizen and a registered voter in Davidson County since 1996, and has voted in almost every election since then. Ms. Player has served as a representative of the Metro Nashville Public School Board since 2019. Since 2014, she has been a member of the League of Women Voters of Nashville and the LWVTN, including as a member of LWVTN's executive board in the past.

42. Under the old plan, which kept all of Davidson County and Nashville within one district, Ms. Player was in CD-5 and was able to elect her candidate of choice. Under the new plan, Ms. Player finds herself in CD-6, which brings in voters from white rural counties who have social, cultural, policy, and community-oriented concerns different from that of Ms. Player and her community.

43.     Plaintiff **RUBY POWELL-DENNIS** lives in newly drawn SD-31, in Memphis. Mrs. Powell-Dennis identifies as Black, is a United States citizen, is registered to vote in Shelby County, and votes regularly. Under last decade's plan, Mrs. Powell-Dennis lived in a part of the increasingly diverse Cordova neighborhood that was in SD-31, but she was removed from SD-31 after the 2021 redistricting. In August 2021, before the new maps had been introduced, Mrs. Powell-Dennis declared that she would be running as the Democratic nominee for SD-31.

44.     After the new Senate map passed, Mrs. Powell-Dennis found that her entire neighborhood was cut out of SD-31, and she could no longer run for the Senate seat in SD-31. In order to be able to run and despite financial hardship, Mrs. Powell-Dennis bought a house in the newly drawn SD-31. She remained committed to representing communities of color in SD-31 who she believed would not have had a candidate of choice for the 2022 General Election. As part of her campaign, she conducted listening tours, spoke with voters on the street, and mobilized voters at her church. Mrs. Powell-Dennis received the substantial majority of Black and Hispanic voters in the 2022 General Election in SD-31.

45.     Mrs. Powell-Dennis is a member of the Tennessee NAACP and a member of the LWVTN. She works for the Dream Defenders, a black freedom organization fighting for safety and a good life for all, training thousands of Black and Brown youth, young adults and students, through campaigns, voter engagement and registration, political education, services and the arts. Under the newly configured SD-31, Mrs. Powell-Dennis is concerned that she as well as other voters of color will not see their desired candidate of choice elected at least for the next decade.

**B. The Defendants**

46.     Defendant **WILLIAM B. LEE**, as governor, signed the redistricting plan into law and is responsible for the enforcement of all enacted laws. *See* Tenn. Const. Art. III, §§ 1, 11.

14

47.     Defendant **TRE HARGETT**, as Secretary of State, is Tennessee's Chief Election Officer, who is responsible for appointing the Coordinator of Elections, currently Defendant Mark Goins, who serves "at the pleasure of the secretary of state" and may make regulations as necessary to carry out the election code with "the concurrence of the secretary of state." Tenn. Code § 2-11-201(a), (c).

48.     Defendant **MARK GOINS** is the Coordinator of Elections, who is tasked with "generally supervising all elections" and [a]uthoritatively interpret[ing] the election laws for all persons administering them." Tenn. Code § 2-11-201(a)(1), (4).

49.     Defendant **STATE ELECTION COMMISSION**, and its seven individual members in their official capacities, **DONNA BARRETT, JUDY BLACKBURN, JIMMY ELDRIDGE, MIKE MCDONALD, SECONDRA MEADOWS, BENNIE SMITH, and KENT YOUNCE**, are tasked with appointing and supervising five election commissioners for each county in Tennessee, who in turn are tasked with overseeing elections and implementing relevant election laws and regulations in those counties. *See* Tenn. Code § 2-12-103(a).

## SPECIFIC FACTUAL ALLEGATIONS

### A.  *Statewide demographic shifts*

50.     Tennessee added approximately 564,735 residents in the last decade, an 8.9% increase in the state's total population.

51.     Accordingly, if voters are equally apportioned between districts, the ideal population size for each of Tennessee's State House Districts is 69,806; the ideal population size for each of Tennessee's State Senate Districts is 209,419; and the ideal population size for each of Tennessee's Congressional Districts is 767,871.

52.     According to the most recent census, from 2020, people of Color ("POC")—meaning all Tennesseans other than white, non-Hispanic residents—made up more than 65% of the population growth in Tennessee between 2010 and 2020.

53.     The 2020 Census also showed that Black residents accounted for 6.1% of the total population growth in Tennessee between 2010 and 2020.  Those who identified as any part Black made up nearly 14.3% of that growth.   Those who identified as Hispanic accounted for approximately 33.5% of that growth.

54.     According to the 2020 census, voters of color make up approximately 26.5% of the voting age population ("VAP") of Tennessee, with 15.1% Black VAP ("BVAP") and 5.7% Hispanic VAP ("HVAP").  And white, non-Hispanic people make up 73.5% of the voting age population ("WVAP").

55.     The growth in Tennessee's population over the last decade from 2010 to the present has been concentrated in and around the State's urban counties, particularly Nashville, in Davidson County.

56.     Davidson County and Shelby County have historically been among the State's most racially and ethnically diverse counties.  Over the past ten years from 2010 to 2020, as Tennessee's Black and POC population have grown at a higher rate than the State's overall population, Davidson County and Shelby County have become increasingly diverse.

57.     The new State Senate and Congressional redistricting plans adopted by Tennessee's Legislature and signed into law by Governor William B. Lee on February 6, 2022, do not reflect these changing demographics and are intentionally designed to diminish the voting rights and electoral power of Tennessee's ethnic and racial minorities.

58.     By the time the map-drawing and redistricting approval process drew to a close, Tennessee State Legislators were well aware of Tennessee's changing demographics and its increasing Black and POC population in certain regions—including in Davidson County and Shelby County—because of, among other things, public testimony before the General Assembly by many of the Plaintiff organizations, in which these organizations repeatedly referenced the changing demographics and growing diversity in these regions.

59.     Nevertheless, the Legislature carved up counties with larger and more concentrated populations of Black and POC voters to undermine the impact of the Black and POC population growth in those areas.

60.     As a result, and as explained further below, the Legislature—through redistricting—purposefully diminished the relative opportunities of Black voters and other voters of color (compared to white, non-Hispanic voters) to elect candidates of their choice in certain districts encompassing Davidson and Shelby Counties.

## B. *The development and introduction of the redistricting plans*

61.     The two challenged plans in this action—the Senate and Congressional plans—passed the full Tennessee Legislature rapidly after they were first formally introduced before the respective House and Senate committees.  The plans moved quickly through the various committees and both houses of the Legislature, with many hearings lasting less than an hour and the maps usually being adopted during the same hearings in which they were introduced in the various House and Senate committees and subcommittees.

62.     The various iterations of the plans were not made accessible to the public on the Legislature's website or any other platform.  Members of the public were not given any specific demographics or street-level data, only an image of the proposed plans.  The first time that

members of the public had access to view the Senate and Congressional plans was mid-January 2022, despite the Legislature having had the 2020 Census demographic data since its release on August 12, 2021.

63.     The demographic data from the 2020 Census was released on August 12, 2021, and the Tennessee State House of Representatives created and appointed members to the House Select Committee on Redistricting ("the House Select Committee") on August 25, 2021.

64.     The House Select Committee was dominated and chaired by Republicans, who comprised 12 of the Committee's 16 members, all of whom were white.  Only two of the 16 members of the Committee were Black.  The chairperson (Representative Curtis Johnson) and vice chairperson (Representative Pat Marsh) were white, and all three Area Redistricting Coordinators, Representative Patsy Hazelwood for East Tennessee, Representative Kevin Vaughan for Middle Tennessee, and Representative Gary Hicks for West Tennessee (collectively, the "Coordinators"), were all white.  These Coordinators had primary responsibility for redistricting in their respective geographic areas, which was to be undertaken in consultation with the chairperson.

65.     On September 8, 2021, the House Select Committee met and adopted the House Redistricting Guidelines (the "Guidelines").  The Guidelines were intended to govern the House redistricting process, including the development of new maps for Tennessee's Congressional Districts (the "Congressional Plan"), and State Senate Districts (the "Senate Plan").

66.     The Guidelines required compliance with the Voting Rights Act of 1965 (the "VRA") and the constitutions of Tennessee and the United States.  They further mandated that any redistricting plan could be submitted only by members of Tennessee's House of Representatives. Public plans could be considered only by the Committee if they were sponsored by a state representative and met several formal requirements, including that all proposals had to provide a

18

plan for the entire state. There was no opportunity for members of the public to submit plans that would cover only their community.

67.     After the adoption of the Guidelines, there was a period for public comment. During that period, various members of the public, including representatives of LWVTN and the Equity Alliance, testified about the importance of transparency and collaboration in the redistricting process, including the ability of community members to comment on proposed maps prior to their approval. Multiple speakers, including a representative from the Tennessee NAACP, also stressed it was essential to keep as many counties whole as possible in any proposed Congressional plans, as required by the Tennessee state constitution; to avoid diluting communities' electoral power; and meaningfully consider the impact of the proposed plans on communities of color.

68.     On October 27, 2021, the House Select Committee reconvened to hear from members of the public. Despite widespread public interest, the Committee set aside less than an hour for this hearing and allowed only 20 individuals to speak on behalf of their communities, meaning that each of them was afforded less than three minutes to express their goals and concerns regarding the redistricting process. Only a few of the individuals allowed to speak were persons of color.

69.     At subsequent meetings, the Committee ignored the concerns that had been expressed by its Black constituents and constituents of color and pressed forward with the redistricting plans that had been drawn up by the Coordinators in consultation with the chair and vice chair.

70.     In the Senate, the Senate Ad Hoc Committee on Redistricting (the "Senate Ad Hoc Committee") adopted guidelines similar to those adopted by the Tennessee House of

19

Representatives. These included compliance with the United States and Tennessee Constitutions as well as the VRA. The Ad Hoc Committee also specified that the Office of Legal Services would have up to seven days to adjust map submissions that failed to comply with Committee guidelines, including constitutional and statutory requirements.

71. Once again, only limited public comment was permitted at this meeting. Several commenters, including representatives from LWVTN and the Tennessee NAACP, stressed the need for a transparent process as well as the importance of keeping cities and counties (such as Davidson County and Shelby County) whole to ensure that Black residents and other people of color continued to be heard. These groups also met with legislators and their staff even before the plans were even introduced to share the same concerns, which were left unheeded.

*i. Senate Plan*

72. The Senate Plan originated with the Tennessee Senate Ad Hoc Committee.

73. On December 14, 2021, the Senate Ad Hoc Committee convened for presentations on maps drawn by community members, including a map submitted jointly by the Equity Alliance and MAPRI.

74. On January 13, 2022, Senator Jack Johnson, Chair of the Senate Ad Hoc Committee, presented, for the first time, a proposed Senate Plan for recommendation to the Senate Judiciary Committee.

75. Senator Jeff Yarbro noted that the proposed Senate Plan packed voters of color into certain districts across Tennessee while splitting apart otherwise cohesive communities in other areas (including some counties where the Black population was split almost in half), thus diluting the voting power of Black voters.

20

76. Although the map had not been previously distributed to the public, the proposed plan was adopted by the Senate Ad Hoc Committee that same day for submission to the Senate Judiciary Committee. All the Committee members who voted for the plan were white.

*ii. Congressional Plan*

77. On January 12, 2022, the House Select Committee reconvened for the presentations and approval of Tennessee's Congressional Plan to the Public Service Subcommittee.

78. Several different community members and organizations—including LWVTN, Civic Tennessee, and the Tennessee NAACP—presented Congressional redistricting plans of their own. As part of the process for developing these plans, each of these organizations had participated in multiple meetings throughout the state to solicit the views of Tennessee voters, including communities and voters of color, and each of the submitted plans evidenced community members' strong desire to maintain the integrity of their counties as part of the redistricting. The all-white Republican members of the House Select Committee refused to allow any of these publicly submitted plans to proceed to a committee vote.

79. The Democratic members of the House Select Committee (through Representative Bob Freeman) also presented their own redistricting plan for Tennessee's nine Congressional Districts. Among other things, the plan provided for the creation of a new district in Middle Tennessee which included a number of neighboring communities with shared interests in public transportation and affordable housing. Like the prior Congressional map, the Democrats' plan also maintained one majority-Black district (Shelby County) (50% + 1 BVAP); it also provided for a new opportunity district in Davidson County and northwest Rutherford County which would have a BVAP of between 35% and 50%. The House Select Committee refused to hold a vote on the plan presented by Representative Freeman.

21

80.     At this same meeting, Representative Pat Marsh unveiled the "Committee Plan" in the House Select Committee.  After minimal discussion, the Committee Plan was approved the same day by the all-white, Republican members of the Committee.  The Committee Plan had never been disclosed to the public.  Moreover, the plan was far less cohesive than any of the public proposals because it split communities of interest.  For instance, the Committee Plan split Davidson County (and thus the city of Nashville) amongst three existing Congressional districts. As a result, large segments of the Nashville community—a sizeable percentage of which is made up of POC—found themselves separated from those white residents of Nashville in the 5th Congressional District with whom they share public services and social ties and had formed a de facto electoral coalition.  Instead, they were shunted into the largely rural, white, non-Hispanic 6th and 7th districts, neither of which have any historical ties to Nashville's affected communities of color, and which have divergent social and policy interests.  This new district configuration, which had no historical precedent, precludes voters of color in these districts from electing their candidates of choice.

81.     For her part, Representative Camper, one of the only two Black legislators on the House Select Committee, noted that some members of the House Select Committee and the public were seeing this proposal for the first time and had not been provided an opportunity to review it in any detail.  Representative Camper moved to table the vote on the Congressional Plan, requesting additional time for her, other members, and the public to analyze its effects.  Her motion was denied.

82.     The House Select Committee then brought the Committee Plan to a vote, and the Committee Plan was advanced as the approved Congressional Plan.  The only two Black members,

22

Representatives Karen Camper and Antonio Parkinson on the House Select Committee, spoke out against the Committee Plan, but were outvoted.

83.     Referring to the impact on the political power of voters of color in Nashville, Representative Parkinson said he was shocked by the proposal and made clear that the Committee Plan would significantly dilute the electoral power of voters of color in Davidson County and noted that it would take the state of Tennessee a "long, long time to recover from this map."

84.     On January 13, 2022, the Senate Ad Hoc Committee on Redistricting introduced and passed a committee Congressional plan which was similar to the Congressional Plan adopted by the House Select Committee on Redistricting.  Senator Yarbro noted that the Committee Plan would divide Nashville and would split the significant minority population in middle Tennessee by putting that population into four different districts, but was ultimately outvoted.

### C.  Further legislative background on the redistricting plans

#### i. *Passage of the Senate Plan*

85.     On January 18, 2022, the Senate Judiciary Committee met to discuss SB 780—the proposed Senate Plan that was adopted by the Senate Ad Hoc Committee.  In the five days between the Ad Hoc Committee vote, when the map was presented for the first time, and the Judiciary Committee meeting, the map was updated to add a fourth majority-POC district.  As with the Congressional map, the updated portions of the Senate map were also distributed in image form, with no accompanying street-level demographic data.

86.     The Senate Judiciary Committee quickly approved the updated SB 780.

87.     On January 20, 2022, the full Senate convened to consider SB 780.  The Republican members offered an amendment, which aligned the redistricting proposal in their bill with that of the map which had passed the Senate Judiciary Committee two days prior.  Senator Yarbro (D)

23

noted that the map approved by the Republican majority did not create a new majority-Black district in SD-19, despite the majority's claims, because that district had been represented by a Black senator since 1969 and had effectively been a majority-POC district for 50 years. By contrast, the Democratic Caucus's plan created new coalition districts—districts in which voters of color can band together to elect their candidates of choice—as well as additional effective majority-POC districts which were not subject to "cracking" or "packing" and provided Black and other voters of color the ability to elect candidates of their choice. Senator Yarbro also echoed concerns from the public that the process as a whole lacked transparency.

88.     The bill that had previously passed the Senate Judiciary Committee, SB 780, also passed the full Senate along party lines: 26-5. Once again, all 26 Senators voting in favor of SB 780 were white, and all three of the Black senators voted against.

89.     On January 24, 2022, the full Tennessee House considered the plan approved by the Senate. Representative Gloria Johnson observed that, under the newly drawn maps, it was possible for someone to cross through three separate Senate districts while traversing only a handful of blocks. Her colleagues ignored her entreaties, however, and the full House went on to vote on and pass SB 780.

90.     On February 6, 2022, Governor Lee signed SB 780 into law.

*ii. Passage of the Congressional Plan*

91.     On January 18, 2022, the Senate Judiciary Committee met to discuss the Congressional Plan (SB 781), which was similar to the one passed by the House Select Committee and the Senate Ad Hoc Committee on Redistricting. The focus of the Senate Judiciary Committee's deliberations centered on Davidson County and whether splitting that county would

dilute the Black vote. Rather than consider specific demographics, the Senate Judiciary Committee was provided only a picture of the proposed map with no street-level data.

92.     Public comment was permitted at this meeting, and the comments about the proposed Congressional maps centered around the fact that the Black vote specifically would be diluted because of the proposed split of Davidson County.

93.     In a 7-2 vote, the Senate Judiciary Committee recommended that the Congressional Plan be passed for consideration by the full Senate. The Senate Judiciary Committee included only two Black members (including Brenda Gilmore), and both members voted against the plan.

94.     On January 20, 2022, the full Senate approved the Congressional Plan 26-5, over the objections of some members who were concerned about the dilution of the Black vote.

95.     The following Monday, January 24, 2022 (12 days after commencement of the formal redistricting process), the Congressional Plan Bill (HB 1034) was heard on the floor of the House and was amended to conform with SB 781, which had been passed by the full Senate.

96.     All amendments, including those trying to remedy the vote dilution of Black voters in the proposed plan, were tabled or withdrawn.

97.     Representative Vincent Dixie, a Black Representative, spoke out against the Congressional Plan—explaining that the majority-sponsored plan would dilute the voting power of Black voters of Davidson County, effectively disenfranchising them. G.A. Hardaway and Harold M. Love, Jr., both Black Representatives, also spoke out against the majority-sponsored plan, stating that the map would diminish the opportunities for Black voters in Tennessee, and specifically in Davidson and Shelby Counties, to elect their candidates of choice.

98.     The full House approved the Congressional Plan in a 70-26 vote. All 13 Black Representatives in the House voted against the Plan.

25

99. Following approval of the new maps in the House, U.S. Rep. Jim Cooper of Nashville, a longtime and well-respected 5th Congressional District representative whose constituency was made up of a coalition of Black, Latino, and crossover white voters concentrated in Nashville, announced he would not seek reelection and spoke out against the new maps—stating that "[t]his is a crisis for Nashville" and that "[g]errymandering is an extinction event for the political life of Nashville."

100. On February 6, 2022, Governor William B. Lee signed SB 781 into law.

### D. The Tennessee Legislature's continued discriminatory agenda

101. Contemporaneously, the Tennessee Legislature continued to show its racial animus, including by pressing race-centric legislation with destructive and discriminatory effects and taking other actions intended to silence Black voices in the political arena.

102. During the 111th General Assembly, many of the same Legislators who supported the maps at issue also voted to pass a law that placed onerous criminal and civil penalties on organizations that conduct voter registration drives for failing to comply with disclosure and pre-registration requirements, submitting "incomplete" voter registration applications, or disseminating communications regarding voter registration that failed to include a compelled disclaimer. *See* 2019 Tenn. Laws Pub. ch. 250, § 9. The impetus for the law's passage appeared to be the submission of thousands of voter registration applications filed by predominately Black voters through voter registration drives held by community organizations operating in Memphis. Within a few months, a federal court enjoined the enforcement of the law—citing First and Fourteen Amendment concerns. See *Tennessee State Conf. of N.A.A.C.P. v. Hargett*, 420 F. Supp. 3d 683 (M.D. Tenn. 2019). The Legislature was ultimately forced to repeal the challenged provisions.

26

103.     In early 2021, State Senator Raumesh Akbari and State House Representative Joe Towns, both Black legislators, sponsored Senate Joint Resolution 80.  The resolution proposed adding to the 2022 ballot a constitutional amendment that would amend the Tennessee state constitution to remove language permitting the use of enslavement and involuntary servitude as criminal punishments and replace it with the statement: "[s]lavery and involuntary servitude are forever prohibited."  Amendment 3, based on SJR 80, 112th General Assembly.  Although the amendment ultimately passed, a handful of Legislators (all white) opposed it, with one representative asserting he was concerned that prisoners might have a right to sue for relief under the revised amendment.  Each one of the dissenting Legislators voted to pass the redistricting plans.

104.     Later that same year, in May 2021, the 112th General Assembly passed a bill, HB 0580/SB 0623, prohibiting public school teachers from engaging their students in academic discussions regarding structural racism and unconscious bias in Tennessee or the United States. *See* HB 0580/SB 0623.  The Tennessee Department of Education promulgated guidelines that set forth a detailed complaint process and disciplinary proceedings against any public school or public-school teacher that promotes such "prohibited concepts."

105.     Citing the need for "efficiency," many of the same Legislators who voted to pass the discriminatory Congressional and House maps in Davidson and Shelby Counties, voted to pass a bill reducing the number of seats on the Davidson County Metro Council by half, from forty to twenty.  The Metro area is one of the most racially and ethnically diverse areas in the State, and the reduction was intended to disproportionately impact (and would have disproportionately impacted) Black voters and other voters of color.  After the bill was signed into law, the Metro Council filed suit in state court, and a panel of three judges enjoined the law.

106.   On April 6, 2023, the 113th General Assembly voted on a resolution to expel two Black representatives—Justin Jones (HD-52) and Justin Pearson (HD-86)—from the Tennessee House for joining in anti-gun protests at the Tennessee capitol after a brutal shooting at a Nashville elementary school left six individuals dead, including three children.   Although a white representative—Gloria Johnson—also joined the protests, she was not expelled.   She would later state that she believed her race was the reason she was able to retain her seat.   Both expelled representatives were elected from majority-POC House districts in Davidson and Shelby Counties, and one of them—Representative Pearson—had also come under attack by Legislators for wearing West African attire on the floor of the House, despite the absence of any rule prohibiting him from doing so.   Many of the Legislators voting to expel Jones and Pearson had also voted to pass the redistricting plans at issue.

107.   During the same legislative session, the 113th Assembly passed HB 1376/SB 817, a bill that gives public institutions of higher education greater leeway to restrict the ability of students to organize protests and gatherings on campus and of professors to teach "a divisive concept."   *See* HB 1376/SB 0817.   One of the bill's sponsors stated during a committee meeting that this bill would allow the KKK to host events on college campuses as long as the organization is designated to be "non-violent."

108.   While lawmakers on the Criminal Justice Committee discussed a bill relating to adding death by electrocution as one alternative to carry out the death sentence, one member of the Committee suggested adding "hanging by a tree" as a method of execution—a clear reference to lynchings.   The Tennessee Black Caucus called for sanctions against and/or resignation by the member.   Their efforts were not successful on either front.

28

### E. Analysis of Tennessee's New 2022 plans

     *i.   <u>Davidson County Congressional Districts CD-5, CD-6, and CD-7</u>*

    109.    Under last decade's Congressional Plan, CD-5 encompassed all of Nashville and most of Davidson County.



**CD-5 under the old plan**

    110.    Since 2002, Black voters and other voters of color—with the help of some white voters—elected Jim Cooper (a white Democrat) to CD-5. These Black voters and other voters of color reside predominantly in Nashville. Representative Cooper continued to represent CD-5 until the maps were passed in 2022 and remained the candidate of choice for most voters of color.

    111.    Since at least 1940 when Representative Percy Priest was the Nashville representative in Congress, Nashville has made up the core of CD-5, and CD-5 has always been known as the Nashville/Davidson County Congressional District. That was the case until 2021.

    112.    After the 2020 Census, CD-5 had 767,871 individuals within its boundaries—which represented 32,408 more individuals than the ideal population size of a Congressional district.

113.     Under the redistricting plan enacted by the Legislature, CD-5 no longer contained all of Nashville and the whole of Davidson County, despite the fact that all of Nashville and Davidson County had been fully contained in one Congressional district for over 50 years.  The new Congressional map splintered Nashville and Davidson County between three separate Congressional Districts—CD-5, CD-6, and CD-7—while pulling into each of them predominantly white, rural populations from neighboring counties.  This destroyed a previously functioning crossover district (hereinafter referred to as "old CD-5") that had reliably elected voters of color's candidates of choice for nearly two decades.  It also subordinated traditional redistricting—such as core retention, maintaining communities of interest and political subdivisions whole, and compactness—to race.



*CD-5, CD-6, and CD-7 close-up under the new plan*



*CD-5, CD-6, and CD-7 in relation to other districts under the new plan*



*Split of Davidson County (county seat Nashville) under the new plan*

114. At the time of the new redistricting, the total population of Davidson County was approximately 715,884, nearly the ideal population size of 735,463. The Legislature could easily have retained 19,579 individuals from neighboring communities already in CD-5 to make up the difference. Instead, the Legislature split Davidson County into three newly gerrymandered districts as follows: 346,457 people from Davidson County remained in CD-5, 188,668 people were added to CD-6, and 180,759 people were added to CD-7.

31

115.     Of the total population that remained in CD-5, 269,872 were of voting age, of which 60.5% are WVAP, 13.3% are HVAP, and 17.6% are BVAP.

116.     Of the 188,668 persons added to CD-6, 151,290 are of voting age, of which 58% are WVAP, 13.3% are HVAP, and 22.6% are BVAP.

117.     Of the 180,759 persons added to CD-7, 151,656 are of voting age, of which 54.2% are WVAP, 6.2% are HVAP, and 31.9% are BVAP.

118.     The chart below reveals how map designers significantly reshuffled the populations of color in Nashville, separating them into three districts.  After the redistricting following the 2010 census, old CD-5 was 23.03% BVAP and 7.48% HVAP, with a combined BHVAP of 30.51%.  Similarly, under the 2020 map, old CD-5, which contained Nashville and Davidson County, was 20.67% BVAP and 10.66% HVAP, with a combined BHVAP of 31.33%.  The old CD-5 reliably elected the candidate of choice of voters of color in Nashville—as evidenced by the continued reelection of Jim Cooper in CD-5 throughout those decades.

| Demographic change under old and new maps: CD-5, CD-6, CD-7 | | | |
|---|---|---|---|
| | *CD-5 WVAP* | *CD-5 BVAP* | *CD-5 HVAP* |
| 2010 | 65.16% | 23.03% | 7.48% |
| 2020 | 61.30% | 20.67% | 10.66% |
| New Map | 71.91% | 11.65% | 8.77% |
| | *CD-6 WVAP* | *CD-6 BVAP* | *CD-6 HVAP* |
| 2010 | 91.51% | 3.78% | 2.88% |
| 2020 | 85.86% | 4.64% | 4.60% |
| New Map | 80.07% | 8.57% | 6.37% |
| | *CD-7 WVAP* | *CD-7 BVAP* | *CD-7 HVAP* |
| 2010 | 84.21% | 9.46% | 3.36% |
| 2020 | 79.15% | 9.65% | 4.80% |
| New Map | 71.91% | 15.36% | 6.21% |

119.    At the end of the decade, and under the 2020 map, CD-6 and CD-7 were at 85.86% WVAP and 79.15% WVAP, respectively.  Under the 2020 map, both of these districts were anchored in rural parts of the State, with large populations of white voters.

120.    CD-6 included counties with predominantly rural, white populations, such as Robertson, Sumner, Wilson, Cannon, Coffee, DeKalb, Trousdale, Macon, Jackson, Clay, Putnam, Overton, White, Pickett, Fentress, and Cumberland.  CD-6 spread across the Cumberland Plateau, the Highland Rim, and the Central Basin, all populated by rural communities.

121.    CD-7 encompassed much of the rural west and parts of middle Tennessee stretching north to the Kentucky border and south near the Alabama border.  Under the old map, CD-7 included Hardeman, McNairy, Chester, Henderson, Hardin, Decatur, Benton, Steward, Houston, Humphreys, Hickman, Lewis, Wayne, Lawrence, Giles, Williamson, Stewart, and Montgomery Counties.  Most of CD-7 was made up of rural and more generally white areas.

122.    Over the past decade, both districts have consistently elected white Republican candidates by margins averaging nearly 40 percentage points.

123.    Under the previous maps, of the three districts, CD-5 had the largest population of color, around 30% BHVAP, and at that percentage, the district was effective for Black voters and other voters of color to elect their candidate of choice.  Under the new 2022 maps, none of the three districts offer Black voters and other voters of color any opportunity to elect their candidate of the choice.

| CD_2022 | POP | VAP | WVAP | BVAP | HVAP | %WVAP | %BVAP | %HVAP |
|---------|-----|-----|------|------|------|-------|-------|-------|
| CD-5 | 767,871 | 582,505 | 418,881 | 67,856 | 51,058 | 71.910% | 11.649% | 8.765% |
| CD-6 | 767,871 | 603,423 | 483,180 | 51,705 | 38,463 | 80.073% | 8.569% | 6.374% |
| CD-7 | 767,871 | 597,796 | 429,888 | 91,844 | 37,116 | 71.912% | 15.364% | 6.209% |

124.    As the charts above shows, the new CD-5 was drawn to include a much higher WVAP percentage and a much lower BVAP percentage.  As a result, the new CD-5 became

33

significantly whiter, going from 61.30% WVAP under the old maps at the end of 2020 to 71.91% WVAP. Compared to what the demographics of the old CD-5 were in 2020, the new CD-5 witnessed an increase in WVAP by 10 percentage points and a decrease in BHVAP by nearly 11 percentage points. The increase in WVAP percentage was achieved by pulling in rural, white voters from middle Tennessee—such as portions of Columbia and Franklin Counties.

125.    In past elections, Black voters and other voters of color in Nashville have coalesced behind the same candidate of choice. Only about half of the white voters in Nashville prefer the same candidates that Black voters prefer. The redrawing of the Congressional plan as to CD-5, CD-6, and CD-7, therefore, disproportionately impacts Black voters in particular.

126.    In fact, in the 2022 general election for CD-7, Odessa Kelly, a Black Democratic candidate, ran against a white Republican candidate, and lost by 22 percentage points, because the votes of Nashvillians in CD-7 were diluted by the votes of white voters in the rural counties that are a part of CD-7.



*Racial shading of Davidson County split under new plan*

127.     The Legislature also split up specific communities of color which had individually and collectively constituted communities of interest, as demonstrated by the maps below.  These communities include Bordeaux, White's Creek, Whiteshire, Parkwood Estates, Troppard Heights, Talbot's Corner, and the East Bank.

128.     Under the previous maps, these communities, tied together by similar cultural, social, religious, and geographic interests, voted together in CD-5 for a candidate with collective appeal.  Under the new map, many of these communities are now in neighboring Congressional Districts, CD-6 and CD-7, which also encompass rural, white counties like Overton, Putnam, Cumberland, White, Van Buren, DeKalb, and Cannon (all in CD-6), Stewart, Houston, Hickman, Perry, and Decatur (all in CD-7).

129.     Thus, in 2022, after the redrawn maps were pushed through the Legislature, Representative Cooper announced that he would not be running in the new CD-5.  From his Twitter account, Representative Cooper wrote:

> Despite my strength at the polls, I could not stop the General Assembly from dismembering Nashville.  No one tried harder to keep our city whole.  I explored every possible way, including lawsuits, to stop the gerrymandering and to win one of the three new Congressional districts that now divide Nashville.  There's no way, at least for me in this election cycle, but there may be a path for other worthy candidates.

130.     The newly drawn CD-5 is also far less compact than it was under the old plans, which had kept Davidson County and Nashville mostly whole.  Under the 2022 plan, CD-5 now sprawls further north and south, with slender tentacles snaking out in either direction to pull in portions of more rural white counties such as Lewis, Maury, Marshall, Williamson, and Wilson. The new plan splits three different counties (Davidson, Williamson, and Wilson).

131. The Legislature did not provide sufficient justification for the drastic split of Nashville and Davidson County—and, in particular, the dispersion of communities of color within Nashville and Davidson County.

132. The only justification provided by Legislators was the purported need to equalize the overall size of the populations in each district. This justification is a pretext. In CD-5, the Legislature only had to move a mere 32,000 people to another district (and could have kept Davidson County whole within CD-5, as it had been for decades). Instead, the Legislature embarked on an exponentially more complicated and convoluted process. The Legislators explicitly chose to redraw the districts in a manner which resulted in breaking apart several more homogenous counties and unnecessarily moving hundreds of thousands of people from one district to another. As demonstrated by the competing proposals submitted to the Redistricting Committees, the populations at issue could have easily been equalized while preserving historical boundary lines and without destroying the electoral influence of communities of color.

133. Consistent with the intent of the Legislature, the results of the 2022 general election are reflective of this split and the dilution of the voting power of Black voters and other voters of color. In CD-5, the candidate of choice of voters of color lost by 13.7 percentage points. In CD-6, the candidate of choice of voters of color lost by a margin of 32.6 percentage points. In CD-7, the candidate of choice of voters of color, a Black candidate, lost by 21.9 percentage points.

*ii. Shelby County Senate Districts, SD-31*

134. The Tennessee Legislature also made racially discriminatory choices in drawing senate districts in Shelby County, shuffling Black voters and other voters of color around the county to dilute their votes just as their candidate of choice—a Hispanic woman—was on the cusp of winning her election. These racially discriminatory choices predominated over traditional

36

redistricting principles, such as compactness, keeping communities of interest whole, and minimizing political subdivision splits, in the redrawing of SD-31.

135.　SD-31 is one of five State Senate districts in Shelby County (the county seat of Memphis). Shelby County boasts the highest Black population of any county in the State—at nearly 55%.

136.　Shelby County is located in the southwest corner of the State and borders two states—Arkansas to its west and Mississippi to its south. The Mississippi River flows along the entire western edge of Shelby County. Memphis, in particular, shares many cultural attributes with the Mississippi Delta region and is considered part of the Mississippi Delta.

137.　As a court for the Northern District of Mississippi described in a redistricting opinion, the Mississippi Delta is:

> [A] distinct geographical area of the state traditionally featuring an agricultural economy concerned with flood control of the Mississippi River. The geography of the Delta has been colorfully and somewhat accurately described as beginning in the lobby of the Peabody Hotel at Memphis, Tennessee, and ending at Catfish Row in Vicksburg, Mississippi. Since early times, concentrations of blacks have resided in the Delta area.

*Jordan v. Winter*, 541 F. Supp. 1135, 1139 n.1 (N.D. Miss. 1982) (internal quotations omitted).

138.　Under last decade's State Senate map (2012), Shelby County had five Senate districts, SDs-29, 30, 31, and 33, all fully contained within Shelby County, and SD-32, which included part of Shelby County as well as portions of Tipton County.

37



*Close-up of State Senate districts in Shelby County under the old plan*



*Close-up of State Senate districts in Shelby County under the enacted plan*

139. Under the new redistricting guidelines adopted by the Tennessee Legislature in 2021, the ideal population of a Senate district was deemed 209,419—with a permissible 10% overall deviation range from 198,948 to 219,890.

140. By the end of the decade, two districts, SD-29 and SD-30, were well below the acceptable 10 percent deviation range, with respective total populations of 184,312 and 187,866. SD-33 had a total population of 198,684, which was below the lowest population in the range, being underpopulated by about 264 people. The remaining two districts (SD-31 and SD-32) were within the 10% range at 209,168 and 210,664, respectively.

141.    At the end of the decade, the total population and the VAP by race in the five districts as drawn in 2012, were as follows in the table below:

| Table: Shelby County SS Districts, Adopted 2012 ("Old" Districts) with 2020 Census Data | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| dist | pop | Vap | wvap | bvap | hvap | avap | pct wvap | pct bvap | pct hvap | pct avap |
| 29 | 184,312 | 144,587 | 34,902 | 98,242 | 5,011 | 2,002 | 24.14% | 67.95% | 3.47% | 1.38% |
| 30 | 187,886 | 138,022 | 31,080 | 87,085 | 14,061 | 1,993 | 22.52% | 63.10% | 10.19% | 1.44% |
| 31 | 209,168 | 162,463 | 93,425 | 45,921 | 10,326 | 7,345 | 57.51% | 28.27% | 6.36% | 4.52% |
| 32 | 210,664 | 158,784 | 113,254 | 26,643 | 5,385 | 7,399 | 71.33% | 16.78% | 3.39% | 4.66% |
| 33 | 198,684 | 148,259 | 23,313 | 102,641 | 15,757 | 3,254 | 15.72% | 69.23% | 10.63% | 2.19% |

142.    The table also shows the significant percentages of voters of color, BVAP, HVAP, and Asian Voting Age Population ("AVAP"), making up the districts in Shelby County.  The only two districts that were above 50% WVAP at the end of the decade included SD-31, which was housed fully in Shelby County and which had a 57.51% WVAP; and SD-32, which was anchored in the eastern part of Shelby County included all of Tipton County, and which had a 71.33% WVAP.

143.    Under the old maps, SD-30 and SD-31 were anchored in Memphis, a majority-Black municipality.  In particular, although SD-31 was majority white, it contained the thriving—and rapidly growing—Black and Hispanic neighborhood of Cordova in Memphis, which is a community of interest.  By the end of the decade, SD-31, with a WVAP of about 57.51% and a combined BHVAP of 35%, had come extremely close to electing a Latina Democrat.  Specifically, in 2018, Gabby Salinas—who was the candidate of choice of voters of color—lost to a white Republican by only 1.8 percentage points.

144.    With the overall increase in populations of color in Shelby County, concentrated primarily in Memphis and its suburbs, the map designers targeted the core communities of color in SD-31 and in part, of SD-32.

145. In particular, the newly drawn SD-31, which was becoming a competitive district by the end of the decade, saw its significant Black and Hispanic populations almost cut in half, as illustrated by the table below (20.26% BHVAP under the new Senate map versus 34.63% under the old Senate map).

146. Race predominated over traditional redistricting principles—such as keeping communities of interest together, compactness, and respecting political subdivisions—in the drawing of the new SD-31. As a result, voters of color no longer have a meaningful opportunity to elect candidates of choice in SD-31. In the new SD-31, a Black Democrat—supported by voters of color—ran against a white Republican and lost by 32.6 percentage points.

147. For example, the previous configuration of SD-31 centered on Cordova, a core community of interest with a diverse population. Under the new configuration, SD-31 no longer centers around Cordova, but instead around Germantown—a much whiter neighborhood. This change was achieved by removing a large chunk of the community of interest of Cordova from SD-31 and swapping it out for the whiter neighborhoods of Germantown to the south and Lakeland to the north.

148. Under the old map, SD-32 encompassed the whiter neighborhoods in the eastern corner of Shelby County and Tipton County. Under the new map, SD-32 centers around rural counties of Tipton and Lauderdale, and also reaches into the northeast portion of Memphis to absorb a high concentration of voters of color.

149. This change allowed map drawers to decrease the overall B + H + A VAP percentage from 39.15% under the old SD-31 (at the end of the decade using 2020 Census data) to around 26.58% under the new SD-31, as illustrated by the following table.

40

| dist | pop | vap | wvap | bvap | hvap | avap | pct wvap | pct bvap | pct hvap | pct avap |
|------|-----|-----|------|------|------|------|----------|----------|----------|----------|
| Table: Shelby County SS Districts, Adopted 2022 ("New" Districts) with 2020 Census Data | | | | | | | | | | |
| 29 | 203,170 | 156,945 | 36,265 | 108,391 | 5,638 | 1,982 | 23.11% | 69.06% | 3.59% | 1.26% |
| 30 | 203,175 | 152,840 | 43,875 | 85,007 | 14,573 | 4,339 | 28.71% | 55.62% | 9.53% | 2.84% |
| 31 | 203,172 | 157,166 | 110,469 | 26,006 | 5,828 | 9,927 | 70.29% | 16.55% | 3.71% | 6.32% |
| 32 | 203,169 | 153,215 | 92,312 | 43,718 | 8,973 | 2,490 | 60.25% | 28.53% | 5.86% | 1.63% |
| 33 | 203,171 | 151,583 | 25,300 | 103,680 | 15,906 | 3,299 | 16.69% | 68.40% | 10.49% | 2.18% |

150.    The cracking of voters of color in Cordova from SD-31 also cannot be justified by compactness concerns or respect for political subdivisions. The Shelby County State Senate districts are now more sprawling and impose artificial splits of the predominately Black city of Memphis—including historically coherent neighborhoods and communities of interest, such as Cordova—amongst the various districts.

151.    The figures below show how the new SD-31 and SD-32 compare to the old SD-31 and SD-32.

*Figure: Old SD-31 and New SD-31 (side-by-side)*



*Old SD-31 (2012 plan)*                    *New SD-31 (2022 plan)*

41

*Figure: Old SD-32 and New SD-32 (side-by-side)*

**Old SD-32 (2012 plan)**                    **New SD-32 (2022 plan)**

152.    A racial analysis of the movement of voters of color into and out of the enacted SD-31 demonstrates that race predominated over traditional redistricting principles in the redrawing of SD-31.  Although SD-31 was within 10% of its ideal population prior to the redistricting, the Legislature removed over 108,000 voters from the district.  Specifically, the Legislature removed approximately 35,000 white voters, approximately 35,000 Black voters and approximately 8,000 Hispanic voters from SD-31.

153.    The voters that were added into SD-31, however, were overwhelmingly white.  The Legislature added almost 52,000 white voters to SD-31, but just over 14,700 Black voters and just over 3,200 Hispanic voters to SD-31.

154.    The overall VAP percentages in SD-31 confirm that the district was cracked.  Under the new plan, SD-31 saw its B+H+A VAP drop from 39.15% to 26.58%.  SD-30 saw its B+H+A VAP drop to 67.99% from 74.73% (BVAP decreased from 63% to 55%), and SD-32 saw its B+H+A VAP increase to 36.02% from 24.83%.

42

155. The Legislature's sole justification for the drastic changes to SD-31 was the purported need to maintain population equality among districts. The scope and nature of the changes undertaken—combined with the feedback from interested community groups, all showing that substantial population equality could be achieved without cracking SD-31's communities of color—demonstrate that this justification is pretextual.

## COUNT I
## 42 U.S.C. § 1983
### Racial Gerrymandering in Violation of the Fourteenth and Fifteenth Amendments to the United States Constitution as to Congressional Districts 5, 6, and 7.

156. Plaintiffs repeat and re-allege each and every allegation in the paragraphs above and below, as if fully set forth herein.

157. Race predominated with respect to the redistricting of Congressional Districts 5, 6, and 7, and the splitting Davidson County between these Districts. In these Districts, Legislators made the conscious choice to manipulate the population of the districts by race. Specifically, Congressional Districts 5, 6, and 7 constitute unconstitutional racial gerrymanders. In these Districts, the map designers and Legislators made the conscious choice to manipulate the population of the Districts by race.

158. Racial considerations, rather than traditional redistricting principles, comprised the controlling rationale behind the Legislature's drawing of Congressional District 5, Congressional District 6, and Congressional District 7.

159. Because racial considerations—not traditional redistricting principles— predominated in the drawing of Congressional Districts 5, 6, and 7, Defendants' justifications for these challenged Districts are subject to strict scrutiny.

160. The drawing of Congressional Districts 5, 6, and 7 cannot survive strict scrutiny.

43

161.    By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiffs rights guaranteed to them by the Fourteenth and Fifteenth Amendments to the U.S. Constitution, and will continue to violate these rights absent relief granted by this court.

**COUNT II**
**42 U.S.C. § 1983**
**Racial Gerrymandering in Violation of the Fourteenth and Fifteenth Amendments to the United States Constitution as to State Senate District 31.**

162.    Plaintiffs repeat and re-allege each and every allegation in the paragraphs above and below, as if fully set forth herein.

163.    Race predominated with respect to the redistricting of State Senate District 31.  In this District, Legislators made the conscious choice to manipulate the population of the District by race.  Specifically, State Senate District 31 in Shelby County constitutes an unconstitutional racial gerrymander.  In this District, the map designers and Legislators made the conscious choice to manipulate the population of the District by race.

164.    Racial considerations, rather than traditional redistricting principles, comprised the controlling rationale behind the Legislature's drawing of Senate District 31.

165.    Because racial considerations—not traditional redistricting principles—predominated in the drawing of Senate District 31, Defendants' justifications for this challenged District is subject to strict scrutiny.

166.    The drawing of Senate District 31 cannot survive strict scrutiny.

167.    By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny the Plaintiffs rights guaranteed to them by the Fourteenth and Fifteenth Amendments to the U.S. Constitution, and will continue to violate these rights absent relief granted by this court.

## COUNT III
## 42 U.S.C. § 1983
## Discriminatory Purpose in Violation of the Fourteenth Amendment to the United States Constitution as to Davidson County Congressional Districts (CD-5, 6, and 7)

168. Plaintiffs repeat and re-allege each and every allegation in the paragraphs above, as if fully set forth herein.

169. 42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

170. Article 1 of the Fourteenth Amendment to the United States Constitution provides: "No state shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction equal protection of the laws."

171. The Congressional Plan—and, specifically, changes in Davidson County—was adopted with the purpose of disadvantaging voters of color and will have a specific dilutive effect on Black voters and other voters of color in these districts.

172. Several of the indicia of discriminatory purpose are present in this case. In particular, there is ample evidence of substantial disparate impact, a history of discriminatory official actions in the State, and a number of procedural and substantive departures from the norms generally followed by the decision-makers. In addition, the legislative and administrative history of the decision also strongly supports an inference that the Legislature acted with discriminatory purpose in drawing and approving Congressional Districts 5, 6, and 7 in Davidson County.

173. Legislators provided inadequate notice of proposed changes, sought to minimize public comment, and inappropriately expedited the legislative process in a manner intended to

45

reduce input from anyone other than the redistricting plan's main proponents. Examples of such conduct include last-minute announcements of legislative hearings; a rushed legislative process; the adoption of amendments without adequate notice (or, in some cases, any notice) to certain Legislators, particularly the Legislature's failure to adopt—and meaningfully consider—plans submitted by groups representing the interests of voters of color; and Legislators' awareness, based on testimony from civil rights groups, including some Plaintiffs, about the racial impact of the Congressional Plan.

174. Defendants will be unable to prove that the Congressional Plan would have been enacted without the discriminatory intent described above.

175. By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny Plaintiffs the rights guaranteed to them by the Fourteenth Amendment to the U.S. Constitution, and will continue to violate those rights absent relief granted by this Court.

**COUNT IV**
**42 U.S.C. § 1983**
**Discriminatory Purpose in Violation of the Fourteenth Amendment to the United States Constitution as to Shelby County State Senate District.**

176. Plaintiffs repeat and re-allege each and every allegation in the paragraphs above, as if fully set forth herein.

177. 42 U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the Constitution or the laws of the United States caused by a person acting under the color of state law.

178. Article 1 of the Fourteenth Amendment to the United States Constitution provides: "No state shall make or enforce any law which shall abridge the privileges and immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property,

without due process of law; nor deny to any person within its jurisdiction equal protection of the laws."

179.    The Senate Plan—and, specifically, changes to Shelby County—was adopted with the purpose of disadvantaging voters of color and will have a specific dilutive effect on voters of color in these districts, and specifically in Senate District 31.

180.    Several of the indicia of discriminatory purpose are present in this case.   In particular, there is ample evidence of substantial disparate impact, a history of discriminatory official actions in the State, and a number of procedural and substantive departures from the norms generally followed by the decision-makers.  In addition, the legislative and administrative history of the decision also strongly supports an inference that the Legislature acted with discriminatory purpose in drawing and approving Senate District 31 in Shelby County.

181.    Legislators provided inadequate notice of proposed changes, sought to minimize public comment, and inappropriately expedited the legislative process in a manner intended to reduce input from anyone other than the redistricting plan's main proponents.  Examples of such conduct include last-minute announcements of legislative hearings; a rushed legislative process; the adoption of amendments without adequate notice (or, in some cases, any notice) to certain Legislators, particularly the Legislature's failure to adopt—and meaningfully consider—plans submitted by groups representing the interests of voters of color; the purposeful pairing of Black incumbents within a given district; and Legislators' awareness, based on testimony from civil rights groups, including some Plaintiffs, about the racial impact of the Congressional Plan.

182.    Defendants will be unable to prove that the Senate Plan would have been enacted without the discriminatory intent described above.

183.    By engaging in the acts and omissions alleged herein, Defendants acted and continue to act under color of law to deny Plaintiffs the rights guaranteed to them by the Fourteenth Amendment to the U.S. Constitution, and will continue to violate those rights absent relief granted by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

i.    Convene a court of three judges pursuant to 28 U.S.C. § 2284(a);

ii.    Declare that Congressional Districts 5, 6, and 7 and State Senate District 31 in Shelby County constitute racial gerrymanders in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution;

iii.    Declare that the portions of the Senate and Congressional plans relating to the drawing of State Senate District 31 and of Congressional Districts 5, 6, and 7, in particular, were enacted with an impermissible discriminatory purpose on the basis of race in violation of the Fourteenth Amendment to the United States Constitution;

iv.    Issue a permanent injunction enjoining Defendants from enforcing or giving effect to the boundaries of the violative Districts, including an injunction barring Defendants from conducting any elections in the violative Districts;

v.    Hold hearings, consider briefing and evidence, and otherwise take actions necessary to determine and order valid plans for the Tennessee Senate and U.S. Congress that do not constitute impermissible and unconstitutional racial gerrymanders and that are not the product of intentional discrimination;

vi.    Make all further orders as just, necessary, and proper to ensure complete relief consistent with the Court's orders; and

vii.     Grant such further relief as the Court deems to be appropriate, including but not limited

to an award of Plaintiffs' attorneys' fees, expenses, and reasonable costs, as authorized

by 42 U.S.C. § 1988 and 52 U.S.C. § 10310(e).

Dated: August 9, 2023

**SPERLING & SLATER**
By:*/s/ Phillip F. Cramer*
Phillip F. Cramer
150 3rd Avenue S, Suite 1100
Nashville, TN 37201
Tel. (312) 224-1512
pcramer@sperling-law.com

**LAWYERS' COMMITTEE**
**FOR CIVIL RIGHTS UNDER LAW**
Jon Greenbaum, *pro hac vice forthcoming*
Ezra D. Rosenberg, *pro hac vice forthcoming*
Pooja Chaudhuri, *pro hac vice forthcoming*
1500 K Street NW, Suite 900
Washington, D.C. 20005
Tel. (202) 662-8600
jgreenbaum@lawyerscommittee.org
erosenberg@lawyerscommittee.org
pchaudhuri@lawyerscommittee.org

**SOUTHERN COALITION FOR SOCIAL**
**JUSTICE**
Jeffrey Loperfido, *pro hac vice forthcoming*
Mitchell D. Brown, *pro hac vice forthcoming*
1415 West Highway 54, Suite 101
Durham, NC 27707
Tel: (919) 323-3380
jeffloperfido@scsj.org
mitchellbrown@scsj.org

**WINSTON & STRAWN LLP**
George E. Mastoris, *pro hac vice forthcoming*
Michelle D. Tuma, *pro hac vice forthcoming*
200 Park Avenue
New York, NY 10166
Tel. (212) 294-6700
gmastoris@winston.com
mtuma@winston.com

*Attorneys For Plaintiffs*

49