**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

TENNESSEE STATE CONFERENCE OF
THE NAACP, et al.,

        Plaintiffs,

v.

WILLIAM B. LEE, in his official capacity as
Governor of the State of Tennessee, et al.,

        Defendants.

Case No. 3:23-cv-00832

Judge Eric Murphy

Judge Eli Richardson

Judge Benita Pearson

**MEMORANDUM IN SUPPORT OF THE
JOINT MOTION TO DISMISS THE COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................... 1

BACKGROUND .......................................................................................................................... 3

    A.    Tennessee Provides Unprecedented Transparency and Public Participation During the 2020 Redistricting Process ................................................................................ 3

    B.    The General Assembly Votes Along Party Lines to Adopt Electoral Maps That Solidified Republican Advantage in State and Federal Elections ................................ 5

    C.    Plaintiffs Delay Bringing Suit For Eighteen Months and Disclaim Any Request for Immediate Relief ...................................................................................................... 6

LEGAL STANDARD ................................................................................................................... 7

ARGUMENT ............................................................................................................................... 8

    I.    The Lawsuit Is Barred By Laches ...................................................................................... 8

        A.    Laches potentially applies to redistricting lawsuits at the motion-to-dismiss stage ...... 8

        B.    Laches applies here because Plaintiffs' filing delay was unreasonable and prejudicial. 9

    II.    The Complaint Does Not State Racial Gerrymandering Claims ................................................. 13

        A.    Plaintiffs did not plausibly allege that race predominated over partisanship during the mapmaking process ...................................................................................... 14

        B.    Plaintiffs never attempted to make the required showing that the mapmakers could have achieved their partisan objectives in more race-neutral ways .............................. 17

    III.    The Complaint Does Not State Intentional Discrimination Claims .......................................... 17

        A.    Plaintiffs did not plausibly allege any discriminatory effect ........................................... 18

        B.    Plaintiffs did not plausibly allege any discriminatory purpose ....................................... 19

    IV.    Governor Lee Should Be Dismissed From This Action ............................................................ 26

        A.    Sovereign immunity bars Plaintiffs from seeking relief against Governor Lee ........... 26

        B.    Plaintiffs lack standing to sue Governor Lee ................................................................ 28

CONCLUSION ............................................................................................................................ 30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott v. Perez,*
    138 S. Ct. 2305 (2018) ........................................................................................................22

*Allied Artists Picture Corp. v. Rhodes,*
    679 F.2d 656 (6th Cir. 1982)............................................................................................28

*Am. Addiction Ctrs., Inc. v. Nat'l Ass'n of Addiction Treatment Providers,*
    515 F. Supp. 3d 820 (M.D. Tenn. 2021) .........................................................................9

*Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n,*
    366 F. Supp. 2d 887 (D. Ariz. 2005) ...................................................................8, 11, 12

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009).................................................................................7, 13, 18, 22

*Backus v. South Carolina,*
    857 F. Supp. 2d 553 (D.S.C. 2012) .................................................................................18

*Baptist Physician Hosp. Org., Inc. v. Humana Mil. Healthcare Servs., Inc.,*
    481 F.3d 337 (6th Cir. 2007)............................................................................................11

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)................................................................................7, 15, 17, 18

*Bethune-Hill v. Va. State Bd. of Elections,*
    580 U.S. 178 (2017) ........................................................................................................13

*Brnovich v. DNC,*
    141 S. Ct. 2321 (2021) ......................................................................................15, 24, 25

*Bronson v. Swensen,*
    500 F.3d 1099 (10th Cir. 2007) ................................................................................29, 30

*Bush v. Vera,*
    517 U.S. 952 (1996)..........................................................................................................15

*Chabot v. Ohio A. Philip Randolph Inst.,*
    140 S. Ct. 102 (2019) .......................................................................................................15

*Chandler v. Harris,*
    529 U.S. 1084 (2000) .........................................................................................................8

*Children's Healthcare Is a Legal Duty, Inc. v. Deters,*
    92 F.3d 1412 (6th Cir. 1996)......................................................................................27, 28

ii

*Common Cause Florida v. DeSantis,*
  2022 WL 19978293 (N.D. Fla. Nov. 8, 2022)..................................................28

*Cooper v. Harris,*
  581 U.S. 285 (2017).................................................................................. 14, 17

*Crookston v. Johnson,*
  841 F.3d 396 (6th Cir. 2016)........................................................................10

*Evans v. Vanderbilt Univ. Sch. of Med.,*
  589 F. Supp. 3d 870 (M.D. Tenn. 2022) .........................................................9

*Easley v. Cromartie,*
  532 U.S. 234 (2001)................................................................................ 14, 17

*Energy Automation Sys., Inc. v. Saxton,*
  618 F. Supp. 2d 807 (M.D. Tenn. 2009) .........................................................3

*Env't Def. Fund v. Tenn. Valley Auth.,*
  468 F.2d 1164 (6th Cir. 1972) .......................................................................8

*Doe v. DeWine,*
  910 F.3d 842 (6th Cir. 2018).......................................................................29

*Farhoud v. Brown,*
  2022 WL 326092 (D. Or. Feb. 3, 2022) ........................................................28

*Fouts v. Harris,*
  88 F. Supp. 2d 1351 (S.D. Fla. 1999) .............................................................8

*Hewitt v. Helms,*
  482 U.S. 755 (1987).....................................................................................30

*Holmberg v. Armbrecht,*
  327 U.S. 392 (1946).......................................................................................9

*Hunt v. Cromartie,*
  526 U.S. 541 (1999).....................................................................................13

*Hunter v. Underwood,*
  471 U.S. 222 (1985).....................................................................................19

*Jones v. City of Lubbock,*
  727 F.2d 364 (5th Cir. 1984)........................................................................24

*Kay v. Austin,*
  621 F.2d 809 (6th Cir. 1980)........................................................................12

*Knox v. Milwaukee Cnty. Bd. of Elections Comm'rs,*
    581 F. Supp. 399 (E.D. Wisc. 1984) ................................................................8, 11

*Lawson v. Shelby County,*
    211 F.3d 331 (6th Cir. 2000) ...........................................................................27

*League of United Latin Am. Citizens v. Abbott,*
    601 F. Supp. 3d 147 (W.D. Tex. 2022) ...........................................................21

*League of Women Voters of Ohio v. Brunner,*
    548 F.3d 463 (6th Cir. 2008) ...........................................................................27

*LensCrafters, Inc. v. Sundquist,*
    184 F. Supp. 2d 753 (M.D. Tenn. 2002) .........................................................28

*Lewis v. Casey,*
    518 U.S. 343 (1996) .........................................................................................28

*Logan Farms v. HBH, Inc. DE,*
    282 F. Supp. 2d 776 (S.D. Ohio 2003) .............................................................9

*Lowery v. Governor of Georgia,*
    506 F. App'x 885 (11th Cir. 2013) ..................................................................30

*Lucking v. Schram,*
    117 F.2d 160 (6th Cir. 1941) .............................................................................9

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .........................................................................................28

*Marshall v. Meadows,*
    921 F. Supp. 1490 (E.D. Va. 1996) ..................................................................9

*Metro. Gov't of Nashville & Davidson Cnty. v. Lee,*
    Nos. 23-0336-I & 23-0395-III(I) (Davidson Co. Chan. Ct. Mar. 13, 2023) ....................23

*Metro. Gov't of Nashville,*
    Nos. 23-0336-I & 23-0395-III(I) (Davidson Co. Chan. Ct. Apr. 10, 2023) ....................23

*McConchie v. Scholz,*
    577 F. Supp. 3d 842 (N.D. Ill. 2021) ...............................................................17

*Memphis A. Phillip Randolph Inst. v. Hargett,*
    473 F. Supp. 3d 789 (M.D. Tenn. 2020) ................................................*passim*

*Miller v. Johnson,*
    515 U.S. 900 (1995) ..............................................................................16, 17, 24

iv

*New England Health Care Emp.'s Pension Fund v. Ernst & Young, LLP,*
    336 F.3d 495 (6th Cir. 2003)...............................................................................3

*North Carolina v. Covington,*
    581 U.S. 486 (2017)...........................................................................................8

*Ohio A. Philip Randolph Institute v. Householder,*
    373 F. Supp. 3d 978 (S.D. Ohio 2019).............................................................15

*Pension Fund v. Ernst & Young, LLP,*
    336 F.3d 495 (6th Cir. 2003).........................................................................3, 27

*Pers. Adm'r of Mass. v. Feeney,*
    442 U.S. 256 (1979).........................................................................................16

*Potter Instrument Co. v. Storage Tech. Corp.,*
    641 F.2d 190 (4th Cir. 1981).............................................................................9

*R.K. by and through J.K. v. Lee,*
    53 F.4th 995 (6th Cir. 2022)............................................................................30

*Russell v. Lundergan-Grimes,*
    784 F.3d 1037 (6th Cir. 2015) ....................................................................26, 27

*Safety Specialty Ins. v. Genesee Cnty. Bd. of Comm'rs,*
    53 F.4th 1014 (6th Cir. 2022) ..........................................................................28

*Sanders v. Dooly County,*
    245 F.3d 1289 (11th Cir. 2001) .....................................................................8, 12

*Seminole Tribe of Fla. v. Florida,*
    517 U.S. 44 (1996)...........................................................................................26

*Shaw v. Reno,*
    509 U.S. 630 (1993)....................................................................................15, 16

*Simpson v. Hutchinson,*
    636 F. Supp. 3d 951 (E.D. Ark. 2022) ............................................................28

*Ohio ex rel. Skaggs v. Brunner,*
    629 F.3d 527 (6th Cir. 2010)...........................................................................18

*Smiley v. Holm,*
    285 U.S. 355 (1932).........................................................................................29

*Stone v. U.S. Postal Serv.,*
    383 F. App'x 873 (11th Cir. 2010) ..................................................................11

*Tennessee State Conf. of NAACP v. Hargett,*
    420 F. Supp. 3d 683 (M.D. Tenn. 2019) ..............................................22

*Tex. Democratic Party v. Abbott,*
    978 F.3d 168 (5th Cir. 2020).............................................................28

*Tulis v. Orange,*
    2023 WL 5012106 (M.D. Tenn. Aug. 7, 2023) ...................................9

*In re Travel Agent Comm'n Antitrust Litig.,*
    583 F.3d 896 (6th Cir. 2009)..............................................................7

*Universal Life Church Monastery Storehouse v. Nabors,*
    35 F.4th 1021 (6th Cir. 2022) ......................................................29, 30

*Veasey v. Abbott,*
    830 F.3d 216 (5th Cir. 2016)............................................................25

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.,*
    429 U.S. 252 (1977)...................................................................18, 19

*Wesley v. Collins,*
    791 F.3d 1255 (6th Cir. 1986) .........................................................18

*White v. Daniel,*
    909 F.2d 99 (4th Cir. 1990)..........................................................8, 12

*Whole Woman's Health v. Jackson,*
    595 U.S. 30 (2021)....................................................................27, 28

*Will v. Mich. Dep't of State Police,*
    491 U.S. 58 (1989).........................................................................26

*Women's Emergency Network v. Bush,*
    323 F.3d 937 (11th Cir.2003)...........................................................29

*Ex parte Young,*
    209 U.S. 123 (1908)..................................................................26, 27

**Constitutions**

U.S. Const. art. I, § 4 ..........................................................................10

Tenn. Const. art. II, § 4................................................................9, 10, 29

**Statutes**

Tenn. Code Ann. § 2-11-201(a) .............................................................27

Tenn. Code Ann. § 2-11-202(a)(1), (4).....................................................27

Tenn. Code Ann. § 2-13-209..............................................................................................12

Tenn. Code Ann. § 2-16-102................................................................................................9

Tenn. Code Ann. § 49-7-1902(1)(A), (C), (N) .....................................................................23

**Rules and Regulations**

Fed. R. Civ. P. 12(b)(6)..................................................................................................3, 7

## INTRODUCTION

In the wake of an unprecedented pandemic that caused lengthy delays to census returns, the Tennessee General Assembly convened to reapportion legislative districts. The General Assembly lawfully carried out its redistricting responsibilities. It created a racially and politically diverse redistricting committee for the first time in State history. It held regular public hearings—featuring comments from several plaintiffs here—to gather redistricting input. And it offered extraordinary transparency into the various map proposals. After all of this, the Republican-controlled General Assembly did what virtually all political bodies do when apportioning district lines. It drew maps that maximized the electoral prospects of the majority party while protecting its own incumbents. The changes turned a 7-2 Republican advantage among congressional seats to an 8-1 Republican advantage by splitting Davidson County and created more politically favorable lines in Senate District 31. Commentators and candidates alike recognized the new map's pro-Republican purpose.

Plaintiffs tell an entirely implausible story. They allege that Congressional Districts 5, 6, and 7, along with Senate District 31, are all in fact racial gerrymanders drawn with the purpose to discriminate against minority voters. They assert that racial animus motivated the mapmakers when drawing those districts. Plaintiffs conspicuously ignore partisanship as a factor altogether.

Leveraging the current political reality that Black voters vote overwhelmingly for Democrats, Plaintiffs observe non-actionable partisan redistricting and see instead racial discrimination. But this case presents none of the hallmarks of a racial gerrymander. None of the challenged maps created (by packing) or destroyed (by cracking) majority-minority districts. The district lines are not bizarrely shaped. Legislators did not shut out minority voters from the redistricting process. And Plaintiffs present no alternative maps showing how the legislature could have accomplished their political goals through more race-neutral means. What they *do* allege, however, is that the new maps pushed out a longtime (white) Democrat congressman in an election cycle where control of the U.S. House of

Representatives turned on razor thin margins. The new maps harmed Democrats by flipping CD-5 to the Republican party.

The timing of this lawsuit confirms that it was sparked by partisan rather than racial concerns. Despite being actively involved in the 2020 redistricting process, Plaintiffs did not bring their racial gerrymandering and purposeful discrimination claims in February 2022 when the maps were enacted. Nor did they bring them any time before the 2022 congressional elections. Seeing the results of those elections, Plaintiffs were still dilatory and in fact waited so long to file this suit they have now agreed to see 40% of this decade's elections occur under maps they say violate the United States Constitution.

This action should be dismissed for several reasons.

*First*, the Panel should dismiss the Complaint based on the equitable doctrine of laches. That doctrine can be applied in the redistricting context. And it should be applied here because Plaintiffs inexplicably delayed bringing their claims for over eighteen months—an unreasonable delay in the context of decennial redistricting. That delay caused the State to suffer prejudice, including the death of a trusted attorney that had been involved in redistricting. The relief Plaintiffs seek will redraw district lines for hundreds of thousands and potentially millions of Tennesseans, affecting the ability of, for example, voters in CD-5 to re-elect their (at that point potentially two-Term) Republican Congressman. Redistricting suits like this one should be brought when the legislation is passed.

*Second*, the Panel should dismiss the Complaint because it fails to state a claim. None of the racial gerrymandering claims are plausibly alleged because Plaintiffs do not even try to show how race predominated over the obvious partisan motivations for the district lines. Similarly, the purposeful discrimination claims are not plausible because Plaintiffs' allegations lack sufficient facts to overcome the presumption of good faith and establish racial animus and discriminatory effect.

*Finally*, at minimum, Governor Lee should be dismissed from this action. He is immune from suit under the Eleventh Amendment. Plaintiffs also lack standing to seek relief against him because he neither caused nor has the power to redress their injuries.

How the Panel adjudicates this motion to dismiss will set an important precedent. The Supreme Court has instructed that plaintiffs must show that race predominated over partisanship and other traditional districting criteria to pursue a racial gerrymandering claim. Here, Plaintiffs ignored that requirement completely with allegations that never mention partisanship or party considerations. If the allegations are enough to move past the pleadings stage and subject state officials to what Plaintiffs admit is the "extreme burden" of discovery, Dkt. 34, Hr'g Tr. 46:24–25, then the floodgates open even further. Plaintiffs' Complaint should be dismissed.

## BACKGROUND

A. **Tennessee Provides Unprecedented Transparency and Public Participation During the 2020 Redistricting Process.**

Every ten years, Tennessee reapportions its legislative districts based on the most recent federal census. The U.S. Census Bureau planned to deliver demographic data starting in February 2021.[1] But the COVID-19 pandemic "delayed census operations significantly."[2] As a result, Tennessee did not receive census data until August 2021—a six-month delay. Dkt. 1 ¶ 63 ("Complaint").

So after receiving the updated demographic information, Tennessee promptly started the redistricting process. On August 25, 2023, the Tennessee House of Representatives appointed

---

[1] James Whitehorne, Timeline for Releasing Redistricting Data, U.S. Census Bureau (Feb. 12, 2021), https://bit.ly/46bOffX. This memorandum contains citation to judicially noticeable materials. *New England Health Care Emp.'s Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003) ("A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice."); *Energy Automation Sys., Inc. v. Saxton*, 618 F. Supp. 2d 807, 810 n.1 (M.D. Tenn. 2009) ("A court may take judicial notice of the contents of an Internet website.").

[2] Whitehorne, *supra* n.1.

members to the House Select Committee on Redistricting, Dkt. 1 ¶ 63.[3] For the first time in Tennessee history, the State House appointed a bi-partisan coalition to serve on the House Select Committee.[4] That bipartisan group included four members from the Democratic party, including two Black state representatives.[5] The Committee's politically and racially diverse composition represented "the distinctive voices of Tennesseans from across all three grand divisions of [the] state."[6] The Senate Ad Hoc Committee on Redistricting, also a bi-partisan group, was vice-chaired by a Black senator.[7]

Throughout the apportionment process, the General Assembly kept the public informed about the status of redistricting and solicited public feedback. On September 8, 2021, the House Select Committee held a public hearing to discuss and adopt redistricting guidelines. Dkt. 1 ¶ 65. The bipartisan and racially diverse Committee unanimously adopted the redistricting guidelines.[8] The Committee opened the floor for public comment. Dkt. 1 ¶ 67. Many members of the public provided feedback, including representatives from plaintiff League of Women Voters of Tennessee, the Equity Alliance, and the Tennessee Chapter of the NAACP. *Id.* And on October 27, 2021, the House Select Committee provided the public with an update and invited further commentary. Dkt. 1 ¶ 68. Nearly two dozen individuals were invited to testify at that hearing, *id.*, including representatives from plaintiffs Tennessee Conference of the NAACP and the League of Women Voters of Tennessee.[9]

---

[3] Tennessee General Assembly, Presentation to the Select Committee on Redistricting 3, capitol.tn.gov (Sept. 8, 2021), https://bit.ly/3ZBQkiI ("Redistricting Presentation").

[4] Cooper Moran, House Speaker Cameron Sexton Establishes First Bipartisan House Select Committee on Redistricting, The Tennessee Star (Aug. 27, 2021), https://bit.ly/3PxbNVm.

[5] *See* Redistricting Presentation at 4, *supra* n.3.

[6] Tennessee House Speaker Unveils Redistricting Panel Members, Associated Press (Aug. 27, 2021), https://bit.ly/3rD05R9.

[7] *See* Tennessee General Assembly, Senate Ad Hoc Committee on Redistricting Agenda for Thursday, January 13, 2022, capitol.tn.gov, https://bit.ly/3ZFoMcf.

[8] Tennessee House of Representatives, House Select Committee on Redistricting, at 44:40–45:01, YouTube (Sept. 8, 2021), https://bit.ly/46zPYLC.

[9] Tennessee House of Representatives, House Select Committee on Redistricting, at 9:30–12:58, 16:39–18:05, YouTube (Oct. 27, 2021), https://bit.ly/3LSqAc4.

Similarly, the Senate Ad Hoc Committee held a hearing to set guidelines for process, including rules for the public to submit proposed maps. Dkt. 1 ¶ 70. Once again, various members of the public testified—including some plaintiffs. Dkt. 1 ¶ 71.

The latest redistricting cycle provided unprecedented transparency. Unlike in the 2010 redistricting, the House Select Committee publicly shared, discussed, and allowed public comment on submitted redistricting plans; the Senate Committee also shared submitted plans publicly.[10] Unlike previous cycles, both chambers held public meetings and provided opportunities for feedback.[11] Most of the plaintiff organizations testified to both chambers, provided reports to the legislative bodies, submitted draft maps, and provided public feedback on the map proposals. *See* Dkt. 1 ¶¶ 15–33.

## B.    The General Assembly Votes Along Party Lines to Adopt Electoral Maps That Solidified Republican Advantage in State and Federal Elections.

The idea to split Davidson County in the congressional map was no secret. Even before the House and Senate Committees released their proposed maps, reports surfaced that the Republican-controlled legislature might split the Democrat stronghold of Davidson County into three pieces.[12] One legislative opponent responded that dividing Nashville into multiple districts would be "an obvious political gerrymander" designed to "water down the Democratic delegation."[13] Indeed.

During public hearings and after providing opportunities for public comment, the House and Senate Committees released and approved their proposed Senate and congressional maps on a

---

[10]    *See* Mary Darby, 2021-2022 Redistricting Update, Think Tennessee (Oct. 22, 2021), https://bit.ly/46g2mAM; Tennessee House of Representatives, House Select Committee on Redistricting, YouTube (Jan. 12, 2022), https://bit.ly/46g2wrS ("Jan. 12, 2022 Hearing"); Tennessee General Assembly, House Select Committee Redistricting, capitol.tn.gov, https://bit.ly/46FygXd.

[11]    Darby, *supra* n.10.

[12]    Kimberlee Kruesi & Jonathan Mattise, Speaker: Nashville US House seat to split in redistricting, Associated Press (Jan. 10, 2022), https://bit.ly/3LJHSIk.

[13]    *See* Jan. 12, 2022 Hearing at 17:20–17:33, 18:00–18:54, *supra* n.10.

materially slower timeline than the 2010 process.[14] The Congressional Map split Davidson County into three districts. The partisan ramifications were widely reported. News outlets recounted that "the Republican-dominated state legislature redrew the [Davidson County] seat during this year's redistricting cycle, in hopes of flipping it from a Democratic-held seat to the GOP."[15] The new map "converted the 5th, previously a reliably Democratic stronghold, into a Republican-friendly district."[16] And the Senate Map likewise protected an "embattled Republican incumbent" in SD-31.[17]

Following the committee vote, the redistricting process likewise continued at a normal pace.[18] Although legislative opponents complained that the proposals diluted Democrats' power, the General Assembly ultimately enacted the maps along party lines. On February 6, 2022, Governor William Lee signed the proposals into law. Dkt. 1 ¶¶ 90, 100.

## C. Plaintiffs Delay Bringing Suit For Eighteen Months and Disclaim Any Request for Immediate Relief.

Plaintiffs Tennessee Chapter of the NAACP, the League of Women Voters, the Equity Alliance, and every single other organizational plaintiff was intimately involved in the redistricting process. Despite monitoring redistricting, those organizations did not file suit once the Governor

---

[14]    In 2012, legislators introduced the congressional and Senate maps on January 10 and secured General Assembly approval by January 13—leaving only three days for public consideration. *See* Redistricting in Tennessee: A Once-in-a-Decade Opportunity to Increase Public Engagement, Part II at 1, Think Tennessee (May 2021), https://bit.ly/3F1C89a ("Redistricting in Tennessee"). Here, by contrast, nearly two weeks passed between the congressional plan's public release (on January 12) and final approval (on January 24). Dkt. 1 ¶¶ 77, 80, 94–95. Likewise, the senate plan was released on January 13 and approved by January 24. Dkt. 1 ¶¶ 74, 87–89.

[15]    Adam Friedman, Republican Andy Ogles wins race for Tennessee's 5th Congressional District, The Tennessean (Nov. 8, 2022), https://bit.ly/48vx3Ud.

[16]    Melissa Brown, Sen. Heidi Campbell announces Democratic bid for new-look 5th Congressional District, The Tennessean (Apr. 4, 2022), https://bit.ly/46xo6b7.

[17]    Adam Friedman, Tennessee senators approve new congressional, Senate districts; House to vote Monday, The Tennessean (Jan. 20, 2022), https://bit.ly/46sx6yN.

[18]    *See* Redistricting Presentation at 22, *supra* n.3.

6

signed the maps into law. Though the Complaint now portrays the maps as racially gerrymandered from their passage, the 2022 election came and went without legal challenge from Plaintiffs.

Finally, on August 9, 2023, eighteen months after the enactment of the maps, and nearly a year after Republicans secured an 8-1 congressional advantage,[19] Plaintiffs brought this action. They claim that the legislature racially gerrymandered Congressional Districts 5, 6, and 7, along with Senate District 31. Dkt. 1 ¶¶ 156–67. They also claim those same districts were drawn to discriminate against racial minorities. *Id.* ¶¶ 168–83. Plaintiffs seek a permanent injunction remedying the alleged constitutional deficiencies, which would apply to the 2026 election at the earliest—as Plaintiffs have disclaimed seeking preliminary injunctive relief. Dkt. 34, Hr'g Tr. 48:1–5, 52:1–5.

## LEGAL STANDARD

A Rule 12 motion tests the legal sufficiency of the complaint. To survive dismissal, a complaint must contain enough "[f]actual allegations" to "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must demonstrate "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Where a complaint points to conduct "merely consistent with" a defendant's liability rather than pleading "facts adequate to show illegality," it "stops short of the line between possibility and plausibility." *Twombly*, 550 U.S. at 557. The court "need not accept as true legal conclusions or unwarranted factual inferences," nor "conclusory allegations or legal conclusions masquerading as factual allegations." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009) (citations omitted).

---

[19] Melissa Brown, Tennessee Republicans plan to split Nashville congressional seat, The Tennessean (Jan. 10, 2022), https://bit.ly/46ieoth (explaining Republicans held a 7-2 advantage in congressional seats); Friedman, *supra* n.15 (explaining Republicans flipped CD-5).

7

## ARGUMENT

### I.    The Lawsuit Is Barred By Laches.

"Relief in redistricting cases is fashioned in the light of well-known principles of equity." *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (per curiam) (cleaned up) (citation omitted). That includes the equitable doctrine of laches, which potentially "applies to redistricting cases as it does to any other." *Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n*, 366 F. Supp. 2d 887, 908 (D. Ariz. 2005) (three-judge panel). Laches bars the requested relief here because Plaintiffs "unreasonably delayed" by waiting over eighteen months to file suit in an electoral context where prompt and predictable rules are paramount. *Env't Def. Fund v. Tenn. Valley Auth.*, 468 F.2d 1164, 1182 (6th Cir. 1972). Defendants are further "prejudiced by this delay" because a trusted attorney-advisor to the State, and possible fact witness, is no longer available. *Id.* Untimely litigation over the maps frustrates the State's interest in the orderly administration of elections.

### A.    Laches potentially applies to redistricting lawsuits at the motion-to-dismiss stage.

Before considering the elements of laches, courts must confront the "threshold legal question" about "whether laches is even potentially applicable in the particular context at issue." *Memphis A. Phillip Randolph Inst. v. Hargett*, 473 F. Supp. 3d 789, 793 (M.D. Tenn. 2020).

In this context, "the court is not prohibited *ab initio* from applying laches by threshold considerations." *Id.* at 793 n.4. Time and again, federal courts have used laches to bar the claims of racial gerrymandering plaintiffs seeking injunctive relief. *See, e.g.*, *Sanders v. Dooly County*, 245 F.3d 1289, 1290–91 (11th Cir. 2001) (per curiam); *White v. Daniel*, 909 F.2d 99, 102 (4th Cir. 1990); *Fouts v. Harris*, 88 F. Supp. 2d 1351, 1353–55 (S.D. Fla. 1999) (three-judge panel), *aff'd sub nom. Chandler v. Harris*, 529 U.S. 1084 (2000); *see also Knox v. Milwaukee Cnty. Bd. of Elections Comm'rs*, 581 F. Supp. 399, 402–04 (E.D. Wisc. 1984) (applying laches to Voting Rights Act claim). This Court, too, has applied laches to lawsuits seeking injunctive relief against allegedly unconstitutional electoral procedures. *Hargett*, 473

F. Supp. 3d at 802. That makes sense given the "flexibl[e]" nature of equity, *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946), the "decennial" nature of redistricting, Tenn. Const. art. II, § 4; Tenn. Code Ann. § 2-16-102, and the strong public interest in prompt decisions about the legality of duly enacted electoral maps.

Laches can be—and in this case, *should be*—decided at the pleadings stage. Although "the defense of laches usually requires factual development beyond the content of the complaint," *Am. Addiction Ctrs., Inc. v. Nat'l Ass'n of Addiction Treatment Providers*, 515 F. Supp. 3d 820, 839 (M.D. Tenn. 2021), that is not true here. Plaintiffs' allegations and judicially noticeable sources "themselves demonstrate" that laches applies, *Tulis v. Orange*, No. 3:22-cv-00911, 2023 WL 5012106, *10 (M.D. Tenn. Aug. 7, 2023) (applying the rule in the statute-of-limitations context), appeal filed No. 23-5804 (6th Cir. Sept. 8, 2023), thus making it "an appropriate issue for a motion to dismiss," *Marshall v. Meadows*, 921 F. Supp. 1490, 1494 (E.D. Va. 1996); *see*, *e.g.*, *Logan Farms v. HBH, Inc. DE*, 282 F. Supp. 2d 776, 790 (S.D. Ohio 2003) (granting motion to dismiss based on laches); *Potter Instrument Co. v. Storage Tech. Corp.*, 641 F.2d 190, 191–92 (4th Cir. 1981) (affirming a laches dismissal); *cf. Evans v. Vanderbilt Univ. Sch. of Med.*, 589 F. Supp. 3d 870, 883 (M.D. Tenn. 2022) ("[If] the allegations in the complaint affirmatively show that the claim is time-barred, dismissing the claim under Rule 12(b)(6) is appropriate." (quoting *Cheatom v. Quicken Loans*, 587 F. App'x 276, 279 (6th Cir. 2014))).

**B. Laches applies here because Plaintiffs' filing delay was unreasonable and prejudicial.**

Laches rests on the principle that "equity aids the vigilant, not those who slumber on their rights." *Lucking v. Schram*, 117 F.2d 160, 162 (6th Cir. 1941). "As parties allegedly facing severe violations of their constitutional rights as a result of the implicated election laws," Plaintiffs "should have been on the proverbial red alert by the time" the maps took effect. *Hargett*, 473 F. Supp. 3d at 801. Yet Plaintiffs sat on their race-discrimination claims for over eighteen months, content to let the State use allegedly unconstitutional maps two out of this decade's five election cycles.

9

Plaintiffs' delay satisfies each of the laches elements.

1. <u>Unreasonable Delay</u>. Plaintiffs' delay reflects an unreasonable "lack of diligence" in the "case-specific circumstances" here. *Id.* at 793 (citation omitted). Plaintiffs knew the factual and legal bases for their claims from the moment the maps were enacted. *Id.* at 792 (citation omitted). After all, most of the organizational plaintiffs—including the TN NAACP, the League of Women Voters, and the Equity Alliance (among others)—testified before the Senate and House committees and actively participated in the redistricting process. Dkt. 1 ¶¶ 19, 23, 27, 30, 33. At odds with the views of every neutral commentator in the press and political world that this was partisan redistricting, a plaintiff organization voiced "concerns about Black vote dilution," "specifically in Davidson and Shelby Counties." Dkt. 1 ¶ 33. These organizations presented their concerns with the map proposals to the Tennessee Legislature, and even issued public statements condemning the maps that the General Assembly adopted as "gerrymandered" by "partisan or racial motivations."[20] The Complaint, too, alleges that the maps have reflected illegal racial animus since their passage. *See* Dkt. 1 ¶ 4. Plainly, Plaintiffs could have "acted sooner." *Hargett*, 473 F. Supp. 3d at 792 (citation omitted).

Though an eighteen-month wait may not trigger laches in the mine-run case, such a delay is unreasonable in the extraordinary context of redistricting where States' constitutional prerogative to create electoral maps is at stake and the process is renewed every ten years. *See* U.S. Const. art. I, § 4, cl. 1; Tenn. Const. art. II, § 4. Permitting a "belated challenge" to State electoral maps interferes with core sovereign functions and comity, injects uncertainty into the political process, and "prejudices the State's interest in holding orderly elections." *Crookston v. Johnson*, 841 F.3d 396, 399 (6th Cir. 2016). This Court has thus previously warned that "would-be challengers to election protocols" should bring "challenges sooner rather than later" to avoid laches. *Hargett*, 473 F. Supp. 3d at 802 (citation omitted).

---

[20] League of Women Voters of Tennessee, Tennesseans deserve fair and consistent districts (Jan. 18, 2022), https://bit.ly/3rIaPO2.

Other courts have likewise rejected redistricting suits on laches grounds in scenarios like this one. In *Arizona Minority Coalition for Fair Redistricting v. Arizona Independent Redistricting Commission*, for example, the court held that the "two[-]year delay" in bringing a Voting Rights Act (VRA) claim was "inexcusable and unreasonable" because the plaintiffs had "ample opportunity" to raise the claim earlier. 366 F. Supp. 2d at 908–09. And in *Knox v. Milwaukee County Board of Elections Commissioners*, the court found a twenty-two-month delay between the adoption of the map and the initiation of the lawsuit unreasonable, particularly given "the efforts made" by the mapmakers to "solicit the contribution of county residents at nearly all stages of the plan's development." 581 F. Supp. at 404. As in those cases, Plaintiffs cannot justify waiting eighteen months to bring this action after participating "at nearly all stages" of the redistricting plan's development. *Id.* And given Plaintiffs' characterization of the maps as egregious racial gerrymanders, more vigilance should be required. *See Hargett*, 473 F. Supp. 3d at 801 (applying laches because, if the law were as "unconstitutional and injurious" "as alleged," the plaintiffs should have sued "long before they did").

2. <u>Prejudice to Defendants</u>. Permitting Plaintiffs' claims to move forward would severely prejudice the State's defense and interest in the orderly administration of elections. To begin, the delay impaired the State's defense because of the intervening death of an important attorney advisor and potential fact witness—John Ryder, who passed away in May 2022.[21] Mr. Ryder could have proven instrumental in assisting in the defense against Plaintiffs' allegations of racial predominance and animus, yet Plaintiffs' delay in filing suit left Defendants with no opportunity to avail themselves of the information and first-hand knowledge he could offer. This deprivation is alone sufficient prejudice for laches purposes. *See, e.g., Baptist Physician Hosp. Org., Inc. v. Humana Mil. Healthcare Servs., Inc.*, 481 F.3d 337, 353 (6th Cir. 2007); *Stone v. U.S. Postal Serv.*, 383 F. App'x 873 (11th Cir. 2010) (per curiam).

---

[21] Yue Stella Tu, Senate redistricting panel hears public proposals without releasing committee draft, The Tennessean (Dec. 14, 2021), https://bit.ly/3Q1j4Ov.

On top of that, Plaintiffs' lone requested remedy would apply only after 40% of the decade's state and federal elections (in 2022 and 2024) have taken place. Dkt. 28, Joint Status Rep. at 2 (Sept. 8, 2023) (requesting a trial in 2025). That middle-of-the-decade relief doubly prejudices Tennessee. For starters, the delayed lawsuit "impos[es] great financial and logistical burdens." *White*, 909 F.2d at 104. Tennessee invested considerable time and resources preparing and administering the current maps over the past two years—and will continue to do so as the 2024 and 2026 elections approach. "As time passes, the state's interest in proceeding with the election increases in importance as resources are committed and irrevocable decisions are made," *Kay v. Austin*, 621 F.2d 809, 813 (6th Cir. 1980) (applying laches to election-related claim), thus magnifying the State's prejudice. Hundreds of thousands of non-parties to this suit (of all races) will, if Plaintiffs get their way, have their electoral choices altered in a way that frustrates their political interests after four years of using the current maps. A court of equity need not blind itself to these countervailing interests.

Likewise, the "instability and dislocation in the electoral system" caused by untimely litigation over the electoral maps will "greatly prejudice" Tennessee. *White*, 909 F.2d at 104. Candidates and prospective candidates make decisions based on expectations in the continued use of the current maps. *See, e.g.*, Tenn. Code Ann. § 2-13-209 (residency requirement for Congress). Tardy lawsuits obliterate those reliance interests. *See Arizona Minority Coal.*, 366 F. Supp. 2d at 908 (using "expectations-based prejudice" to justify laches). The public would also suffer from this belated challenge because late-in-the-decade redistricting "would confuse voters" whose districts might abruptly change mid-decade after multiple elections. *Sanders*, 245 F.3d at 1290. This "chaotic impact" on state elections supports application of laches. *Hargett*, 473 F. Supp. 3d at 801. So does discouraging "sluggish election-procedure challenges," *Crookston*, 841 F.3d at 399, that risk disrupting Tennessee's elections for years.

In short, Plaintiffs delayed bringing this lawsuit eighteen months and the judicially noticeable record proves there is no excuse. The Court should dismiss this action with prejudice based on laches.

12

## II. The Complaint Does Not State Racial Gerrymandering Claims.

Counts I and II allege that the General Assembly racially gerrymandered Congressional Districts 5, 6, 7 and Senate District 31. "[A] plaintiff alleging racial gerrymandering bears the burden 'to show . . . that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district.'" *Bethune-Hill v. Va. State Bd. Of Elections*, 580 U.S. 178, 187 (2017) (quoting *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). As Plaintiffs put it, the facts must show that race was "the main reason that the legislature acted the way that they did." Dkt 34, Hr'g Tr. 28:24–25. "[A] jurisdiction may engage in constitutional political gerrymandering, even if it so happens that the most loyal Democrats happen to be black Democrats and even if the State were *conscious* of that fact." *Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) (alteration in original). The plausibility standard is not met by a complaint that does not even address the self-evident (to every commentator under the Sun) partisan motive behind the districts that are the subject of the complaint.

The Complaint does not overcome the legislative presumption of good faith and satisfy the "demanding" standard required to plead actionable racial gerrymandering claims. *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (quoting *Miller*, 515 U.S. at 928 (O'Connor, J., concurring)). The challenged districts lawfully maximize Republican seats in Congress and the State Senate. In the face of this "obvious alternative explanation," *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567), Plaintiffs did not plausibly allege that race predominated over partisanship; instead, they ignore partisanship altogether. Nor have they plausibly alleged that the General Assembly could have achieved their political objectives via maps that were more race neutral. Counts I and II fail to state a claim.

**A. Plaintiffs did not plausibly allege that race predominated over partisanship during the mapmaking process.**

In Tennessee, race "is highly correlated with political affiliation." *Cromartie II*, 532 U.S. at 242.[22] So a racial gerrymandering plaintiff must show that "race *rather than* politics *predominantly* explains" the challenged districts. *Id.* at 243 (alteration in original).

The Complaint is fatally deficient because it implausibly fails to address an obvious alternative explanation for the challenged districts—namely, partisanship. Plaintiffs acknowledge that the pivotal House Select Committee "was dominated and chaired by Republicans." Dkt. 1 ¶ 64. No surprise, then, that the General Assembly passed both maps along party lines.[23] Compared to the congressional map from the 2010's, which "heavily favored the Democrats," the new map "flips that dynamic and heavily favors the GOP."[24] CD-5 was "undoubtedly drawn to give the advantage to a Republican candidate."[25] The Republican-controlled legislature divided Nashville "into multiple districts to dilute the Democratic base and shift more power to the Republicans."[26] Even opponents described the split of Davidson County as "an obvious political gerrymander."[27] The same goes for Shelby County, "where the new Senate map appears to protect [the] embattled Republican incumbent."[28]

Despite this obvious explanation for the challenged maps, Plaintiffs made no effort "to disentangle race from politics." *Cooper v. Harris*, 581 U.S. 285, 308 (2017). Of course, "partisan motives

---

[22]  *See, e.g.*, Tennessee Election Results 2018, Politico (Oct. 2, 2018), politi.co/3ZDWu1P (reporting that "counties with higher minority populations tended to favor the Democrats").

[23]  Tennessee General Assembly, SB 0780 Votes, capitol.tn.gov, https://bit.ly/46miUad, *with* Tennessee General Assembly, SB 0781 Votes, capitol.tn.gov, https://bit.ly/46L2yrs.

[24]  Friedman, *supra* n.15.

[25]  J. Holly McCall, Editor's Column: Dearth of Democratic candidates in CD 5 leaves voters underrepresented, Tennessee Lookout (Feb. 28, 2022), https://bit.ly/3F2R3zT.

[26]  David Plazas, Redistricting is as unsexy as it sounds, but the outcome matters for citizens, The Tennessean (Dec. 3, 2021), https://bit.ly/3RL9lgv.

[27]  Jan. 12, 2022 Hearing, *supra* n.10.

[28]  Friedman, *supra* n.17.

are not the same as racial motives." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349 (2021). And although Plaintiffs generally allege the mapmakers "split communities of interest," made districts less compact, and disproportionately affected voters of color, Dkt. 1 ¶¶ 80, 113, 130, 150, those actions likewise "support an inference of partisan intent," *see Ohio A. Philip Randolph Inst. v. Householder*, 373 F. Supp. 3d 978, 1096 (S.D. Ohio 2019) (three-judge panel), *vacated on other grounds by Chabot v. Ohio A. Philip Randolph Inst.*, 140 S. Ct. 102 (2019). By ignoring partisanship as an explanation for the challenged districts, Plaintiffs failed to "nudge [their] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570; *see Bush v. Vera*, 517 U.S. 952, 968 (1996) ("If district lines merely correlate with race because they are drawn on the basis of political affiliation, which correlates with race, there is no racial classification to justify.").

The appearance of the challenged districts reaffirms the implausibility of the racial gerrymandering claims. "[R]eapportionment is one area in which appearances do matter." *Shaw v. Reno*, 509 U.S. 630, 647 (1993). Bizarrely shaped districts may support an inference of racial animus. *Id.* Consider the racially gerrymandered Congressional Districts 12 and 1 in *Shaw v. Reno* (below, in bright green with the appearance that someone drew a disjointed line with a marker; and in red), which Plaintiffs have sought to compare to their challenge, *see* Dkt 34, Hr'g Tr. 22:22:



APPENDIX
NORTH CAROLINA CONGRESSIONAL PLAN
Chapter 7 of the 1991 Session Laws (1991 Extra Session)

15

*Shaw*, 509 U.S. at 659 (color added). Those sprawling lines look nothing like the relatively compact districts here (Congressional Map on the left; Senate District 31 on the right):




*New SD-31 (2022 plan)*

Dkt. 1 ¶¶ 113, 151. The challenged maps simply lack "lines of a dramatically irregular shape," *Shaw*, 509 U.S. at 633—the hallmark of gerrymandered districts.

Because these maps are not unusually shaped, Plaintiffs fall back on their allegation that the General Assembly "was well aware" that the proposed maps would "adversely impact Black voters" yet still "forg[ed] ahead" by enacting those plans anyway. Dkt. 1 ¶¶ 3–4. That is a statement of a winning case for the defendants, not a plausible one for the Plaintiffs. The required intent is not mere "volition" or "awareness of consequences." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). Plaintiffs instead must show that a legislature passed a law "'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Id.* After all, "when members of a racial group live together in one community, a reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes." *Miller*, 515 U.S. at 920 (quotation omitted). In the redistricting context, a partisan motive to improve Republican prospects is the same as one that adversely impacts those for Democrats. Given the current political reality regarding the correlation between Black voters and Democratic voters, awareness of this impact plausibly suggests absolutely nothing about any improper racial motive.

16

The Complaint's allegations on their face are plausibly consistent with partisan gerrymandering. That is not enough to survive a motion to dismiss, *see Twombly*, 550 U.S. at 554, especially in this context where courts must exercise "extraordinary caution," *Miller*, 515 U.S. at 916.

**B**. **Plaintiffs never attempted to make the required showing that the mapmakers could have achieved their partisan objectives in more race-neutral ways.**

Plaintiffs had to show "at the least" that the General Assembly "could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional redistricting principles" yet promote "significantly greater racial balance." *Cromartie II*, 532 U.S. at 258. Only then can a court be sufficiently sure that "race, rather than politics, predominantly accounts for the result" challenged. *Id.* at 257.

The Complaint alleges no facts to make that showing. Although a racial gerrymandering claim does not always require an alternative map to prove the presence of a more race-neutral alternative, *see Cooper*, 581 U.S. at 319–22, one is necessary here where there is no "direct evidence of a racial gerrymander," *id.* at 322. Plaintiffs presented no alternative map here. Nor did they plausibly allege that the General Assembly could have achieved their political objectives in an alternative manner while also bringing about "greater racial balance." *Cromartie II*, 532 U.S. at 258. The court should reject the racial gerrymandering claim because "Plaintiffs have not offered any alternative way that [the defendants] could have drawn the district[s] 'without sacrificing' their legitimate" partisan goals. *McConchie v. Scholz*, 577 F. Supp. 3d 842, 882 (N.D. Ill. 2021) (per curiam) (three-judge panel).

**III.    The Complaint Does Not State Intentional Discrimination Claims.**

Counts III and IV allege that the General Assembly purposefully discriminated against voters of color when drawing Congressional Districts 5, 6, 7 and Senate District 31. Dkt. 1 ¶¶ 168–83. To state an intentional discrimination claim under the Fourteenth Amendment, the Complaint must plausibly allege that "[1] the districting scheme has a discriminatory effect and [2] the legislature acted

with a discriminatory purpose." *Backus v. South Carolina*, 857 F. Supp. 2d 553, 567 (D.S.C. 2012) (three-judge panel); *see Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266–67 (1977).

Plaintiffs have not plausibly alleged either element. After setting aside the Complaint's "legal conclusions," "[t]hreadbare recitals of the elements of a cause of action, and "mere conclusory statements," *Iqbal*, 556 U.S. at 678, the intentional-discrimination claims do not cross "the line from conceivable to plausible," *Twombly*, 550 U.S. at 570. The explanation for the challenged districts is partisanship not racial animus. Nothing in the Complaint supports a contrary conclusion.

**A.  Plaintiffs did not plausibly allege any discriminatory effect.**

Plaintiffs claim the enacted maps have "a specific dilutive effect on Black voters and other voters of color in [the challenged] districts." Dkt. 1 ¶ 171. But that allegation lacks plausibility because voters of color are not "effectively denied" their opportunity to secure electoral representation. *Wesley v. Collins*, 791 F.2d 1255, 1259 (6th Cir. 1986). Democrats—of all races—are the only group harmed by the maps. This lack of racially discriminatory effect alone forecloses Counts III and IV.

To be clear, Plaintiffs have not brought a VRA claim and do not assert vote dilution under Section 2 of the VRA. Dkt. 34, Hr'g Tr. 25. Nor do Plaintiffs allege that minority voters are denied "the equal opportunity to participate in the political process." *Wesley*, 791 F.2d at 1262. As was true under the old maps, in which minority voters comprised less than *one third* of the voting age population in CD-5, Dkt. 1 ¶ 118, those voters may still form coalitions to support their candidate of choice. Plaintiffs do not claim otherwise. Plaintiffs have only alleged dilution "at a nose-bleed level of generality," *Ohio ex rel. Skaggs v. Brunner*, 629 F.3d 527, 532 (6th Cir. 2010), which is not enough to show a discriminatory effect. The lack of discriminatory effect is especially pronounced with respect to CD-6 and CD-7. Over the past decade, those districts "have consistently elected" Republican candidates "by margins averaging nearly 40 percentage points." Dkt. 1 ¶ 122. It is thus implausible that the new maps meaningfully affect minority voters' ability to elect their candidates.

18

**B. Plaintiffs did not plausibly allege any discriminatory purpose.**

Plaintiffs' allegations of discriminatory purpose do not adequately support their claims. "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent." *Vill. of Arlington Heights*, 429 U.S. at 266. To conduct that inquiry, courts generally examine (1) "[t]he historical background of the [challenged] decision," (2) "[t]he specific sequence of events leading up to the challenged decision," (3) "[d]epartures from normal procedural sequence," and (4) "the legislative history of the decision." *Id.* at 267–68. Intentional-discrimination claims are not plausible unless the Complaint alleges facts that, if proven, would make it more likely than not that a discriminatory purpose motivated the mapmakers. *See Hunter v. Underwood*, 471 U.S. 222, 225 (1985) (applying preponderance standard to discrimination claims).

Here, none of the *Arlington Heights* factors supports an inference of discriminatory intent. Although Plaintiffs' animus allegations point to procedural irregularities, a recent history of allegedly discriminatory conduct, and the legislative history, the facts pled fall far short of overcoming the presumption of good faith and plausibly establishing discriminatory purpose.

1. <u>Procedural & Substantive Irregularities</u>. Plaintiffs allege multiple "procedural and substantive departures from the norms" that ostensibly support an inference of racial animus. Dkt. 1 ¶¶ 172, 180. These abnormalities include an unusually "rushed" legislative process and efforts to suppress public comment. *Id.* ¶¶ 173, 181. Plaintiffs are wrong—the 2020 redistricting process unfolded at a historically average pace with ample opportunity for public comment.

Start with the accusation that the legislature "minimize[d] public comment" and "stifle[d] any meaningful debate or dissent" about redistricting. Dkt. 1 ¶¶ 7, 173. Those assertions are baseless, as Plaintiffs' own allegations betray. The Complaint confirms that the public had many opportunities to engage with the mapmakers over the course of months:

19

- "Numerous civil rights groups" "testified before the Tennessee Legislature" during the redistricting process. *Id.* ¶ 4.

- Plaintiff Tennessee NAACP "gave public testimony before both the Senate and House redistricting committees, submitted a Congressional concept map," and "presented a report to the House and Senate redistricting subcommittees." *Id.* ¶ 19.

- Plaintiff League of Women Voters of Tennessee "was active" in the redistricting process, with the President of the organization "testifying before both the House and Senate redistricting committees on the impact that the proposed House, Senate, and Congressional plans would have on Tennessee voters." *Id.* ¶ 23. The League "also submitted a Congressional concept map" and then "compiled and distributed" community feedback on the proposals "to both the House and Senate redistricting committees." *Id.*

- Plaintiff Equity Alliance testified about redistricting, submitted maps on behalf of itself and Plaintiff Memphis A. Philip Randolph Institute, and "spoke with Legislators about the proposed maps." *Id.* ¶¶ 27, 30.

- Plaintiff African American Clergy Collective raised "concerns about the redistricting process" with the House committee and "met with a number of elected [legislators]." *Id.* ¶ 33.

This small sampling of public input disproves Plaintiffs' public-participation position. And as for the allegation that the House Select Committee approved the Congressional Map the same day it was announced to the public, Plaintiffs did not allege that timeline was irregular—and indeed, that process was consistent with historical practice.[29]

In fact, the 2020 redistricting was the most transparent and collaborative in state history. The House of Representatives appointed a politically and racially diverse redistricting committee for the first time ever.[30] And unlike previous redistricting cycles, both chambers held public meetings and provided opportunities for public comment before and after legislators released the proposed maps. Nonpartisan institutions commended the House Select Committee for making "the critical decision"

---

[29] Redistricting in Tennessee at Part II, 1, *supra* n.14 (stating that the committee introduced and passed congressional and Senate maps on the same day during the 2010 redistricting cycle).

[30] Moran, *supra* n.4.

to share "publicly submitted redistricting plans"[31]—something that did not happen in 2010 redistricting cycle.[32] Even some *Plaintiffs* praised the legislature for providing opportunities "for [people's] voices to be heard" during the various hearings.[33]

Nor was the redistricting process unusually rushed, and the credibility-killing lack of acknowledgment of the pandemic and its effect on the Census impairs the plausibility of Plaintiffs' entire exercise. *Cf. League of United Latin Am. Citizens v. Abbott*, 601 F. Supp. 3d 147, 173 (W.D. Tex. 2022) (no procedural irregularity under *Arlington Heights* because "the pandemic" "adequately explains Texas Republicans' decision to rush the redistricting process"). The Census Bureau released demographic data in mid-August 2021. Dkt. 1 ¶ 63. Two weeks later, the Tennessee House created the House Select Committee on Redistricting. *Id.* In September and October 2021, the House Select Committee held public meetings to discuss redistricting guidelines and solicit public feedback. *Id.* ¶¶ 65, 68. Once the General Assembly began session in January 2022, the House Select Committee welcomed public discussion on proposed maps and then presented the proposed congressional plan. *Id.* ¶¶ 77–79. On January 18, 2022, after giving legislators and the public almost a week to review the proposal, the Senate Judiciary Committee deliberated and opened the committee floor for public comment. *Id.* ¶¶ 8, 91–92. On January 20, 2022, the Senate approved the Congressional Plan. The House approved it four days later. *Id.* ¶ 95. The Senate Map was adopted along a similar timeframe. *See id.* ¶¶ 72–76, 85–90. Plaintiffs have alleged no facts showing that this timeline is abnormal for redistricting in Tennessee, because it is not.[34] If anything, legislators and the public had an unusually

---

[31] Mary Darby, Statement Ahead of This Week's Redistricting Hearings In the Tennessee General Assembly, Think Tennessee (Dec. 13, 2021), https://bit.ly/46hXsmH.

[32] Think Tennessee, *supra* n.10.

[33] Jan. 12, 2022 Hearing at 1:00:10–1:00:35, *supra* n.10.

[34] *See* Redistricting Presentation at 22 *supra* n.3; *supra* n.14.

*large* amount of time to consider the proposals. In the previous cycle, the General Assembly introduced and approved the maps in three days; this time, it took twelve.[35]

Even if that (historically average) pace seems expedited, that *still* does not raise an inference of "invidious discrimination" given the "obvious alternative explanation" for any perceived urgency. *Iqbal*, 556 U.S. at 682 (quoting *Twombly*, 550 U.S. at 567). Start with the COVID-19 pandemic, which caused the Census Bureau to deliver demographic data nearly *six months* later than originally planned.[36] Those delays required legislators to move efficiently, yet the General Assembly still provided unprecedented opportunities for public comment. Plaintiffs nowhere plausibly explained why the procedural flaws they allege stem from racism, rather than being "consistent with a time-pressed legislature seeking partisan advantage." *Abbott,* 601 F. Supp. 3d at 176. Given that context, the alleged "brevity of the legislative process" hardly "can give rise to an inference of bad faith," racially discriminatory action. *Abbott v. Perez*, 138 S. Ct. 2305, 2328–29 (2018).

2. <u>History of Allegedly Discriminatory Official Actions</u>. Plaintiffs cite various events that allegedly reveal the General Assembly's "discriminatory agenda" and "racial animus." Dkt. 1 ¶ 101. None of those events even plausibly supports an inference that race discrimination drove redistricting.

As their primary evidence of racial animus, Plaintiffs point to now-repealed legislation regulating voter registration. Without any factual or legal support, Plaintiffs claim the General Assembly enacted that regulation in response to voter applications submitted by Black voters. Then Plaintiffs explain the law was enjoined based on "First and Fourteenth Amendment concerns." Dkt. 1 ¶ 102 (citing *Tennessee State Conf. of NAACP v. Hargett*, 420 F. Supp. 3d 683 (M.D. Tenn. 2019)). But that injunction stemmed from a First Amendment holding, not any concerns about race discrimination or equal protection. *Hargett*, 420 F. Supp. 3d at 698–711. Neither the enactment of the voter

---

[35] *Supra* n.14.

[36] Whitehorne, *supra* n.1.

registration law nor *Hargett* supports the remarkable allegation that the General Assembly acted out of racial animus and a discriminatory agenda.

Plaintiffs' additional allegations fare no better. They incorrectly allege that the General Assembly has banned public-school teachers from "engaging their students in academic discussions regarding structural racism and unconscious bias." Dkt. 1 ¶ 104. The cited law does no such thing. It instead prohibits instruction on discretely defined "[d]ivisive concept[s]," such as the odious idea that one "race or sex is inherently superior or inferior to another," that "[a]n individual should be discriminated against or receive adverse treatment because of the individual's race or sex," or that "[g]overnments should deny" to anyone "the equal protection of the law." Tenn. Code Ann. § 49-7-1902(1)(A), (C), (N); *id.* § 49-6-1019(a). Teachers may still discuss "[t]he history of an ethnic group" and provide "impartial instruction on the historical oppression of a particular group." *Id.* § 49-6-1019(b), (1), (3). Promoting equal treatment of all people is the opposite of exhibiting racial animus.

Next, Plaintiffs point to a law reducing the size of the Davidson County Metro Council. They speculate this reduction was "intended to disproportionately impact" "Black voters and other voters of color." Dkt. 1 ¶ 105. Yet nothing in the legislative record or subsequent litigation suggests improper racial motivations. Indeed, the plaintiffs challenging that action did not allege racial animus or bring any discrimination claims. *See generally* Compl., *Metro. Gov't of Nashville & Davidson Cnty. v. Lee*, Nos. 23-0336-I & 23-0395-III(I) (Davidson Co. Chan. Ct. Mar. 13, 2023), https://bit.ly/3rwbaUa. A court later enjoined the law on the ground it likely violated Tennessee's Home Rule Amendment. Mem. & Order on Plfs.' Mots. for Temp. Injunction 21–22, *Metro. Gov't of Nashville*, Nos. 23-0336-I & 23-0395-III(I) (Davidson Co. Chan. Ct. Apr. 10, 2023) (Exhibit A). That unrelated decision cannot plausibly aid Plaintiffs' racial-animus showing. The Court can also take judicial notice that Democrats run the Davidson County Metro Council, that they voted against allowing the Republican National Committee

to have its 2024 convention in Nashville, and that commentators have observed that the issue between the General Assembly and the Metro Council has something to do with politics.[37]

Nor do the expulsion votes that Plaintiffs highlight support an inference of racial animus. In April 2023, more than a year *after* the maps were enacted, three state representatives breached decorum by leading members in the public gallery of the House of Representatives in disruptive protests. In response to that violation of House Rules, there were 72 votes to expel Representative Jones, 69 votes to expel Representative Pearson, and 65 votes to expel Representative Johnson.[38] That Representative Johnson (who is white) garnered a handful fewer expulsion votes than Representatives Pearson and Jones (who are Black) does not show racial animus. "[T]he good faith of a state legislature must be presumed," *Miller*, 515 U.S. at 915, and the reason for the voting disparity can be explained by the varying degrees of culpability exhibited by the three representatives. Even *if* the court retroactively imputed improper motives to the legislators who voted to expel only the Black representatives, only four legislators qualify. Of those, only two voted for the challenged maps—and none held leadership roles.[39] Regardless, if even the animus of a bill's sponsor cannot support Plaintiffs' "cat's paw" theory of discrimination against "legislative bodies," *Brnovich*, 141 S. Ct. at 2350, it follows *a fortiori* that the subsequent motives of two legislators cannot. *See Jones v. City of Lubbock*, 727 F.2d 364, 371 n.3 (5th Cir. 1984) (refusing to "judge intent from the statements [made by] . . . a single member").

The same principle forecloses Plaintiffs' reliance on isolated incidents from a "handful" of legislators. Dkt. 1 ¶ 103. For example, Plaintiffs allege that some legislators voted against a proposed

---

[37]  *See* Cassandra Stephenson, Nashville unlikely to host Republican National Convention after council quashes bill, The Tennessean (Aug. 2, 2022), https://bit.ly/3LUFRt1; Kimberlee Kruesi, Judges block Tennessee Republican move to cut Nashville council in half, PBS News Hour (Apr. 10, 2023), https://to.pbs.org/3F50Gy5.

[38]  Nashville Tennessean, How Tennessee lawmakers voted in Thursday's House expulsion debate, The Tennessean (Apr. 7, 2023), https://bit.ly/46g7V2d.

[39]  *Compare supra*, n.38, *with supra* n.23.

constitutional amendment forbidding "the use of enslavement and involuntary servitude as criminal punishments." *Id.* But the relevant Resolution garnered overwhelming support—passing the House 81-2 and the Senate 26-4—including from over six dozen legislators who voted for the challenged maps.[40] And those few in opposition generally supported the Resolution but identified concerns with language (omitted from the Complaint) providing that "[n]othing in" the amendment "shall prohibit an inmate from working when the inmate has been duly convicted of a crime."[41] Plaintiffs' after-the-fact "isolated and ambiguous statements" made by legislators during unrelated committee meetings are likewise paltry evidence of discriminatory purpose. *See* Dkt. 1 ¶¶ 107–08; *Veasey v. Abbott*, 830 F.3d 216, 234 (5th Cir. 2016). Such statements by a "handful" of lawmakers do little to establish the maps' discriminatory intent as a general matter, *Brnovich*, 141 S. Ct. at 2350, let alone here, where Plaintiffs do not allege that the relevant legislators led the mapmaking process.

3. <u>Legislative History of Challenged Maps</u>. Plaintiffs last allege that "the legislative and administrative history" of the 2022 redistricting "strongly supports an inference" of discriminatory purpose. Dkt. 1 ¶ 172. In support, Plaintiffs mostly repackage already debunked accusations. They complain about the "rushed" legislative process that resulted in "inadequate notice" during redistricting. Dkt. 1 ¶ 173. But the process was not rushed, and the public—including plaintiffs—robustly participated in the latest redistricting. *Supra* Argument III.B.1. Plaintiffs next cite the fact that the legislature "fail[ed] to adopt" "plans submitted by groups representing the interests of voters of color" as proof of racial animus. Dkt. 1 ¶ 173. The idea that failing to adopt Plaintiffs' preferred plans must mean racism turns the presumption of good faith on its head and would allow most every claim

---

[40]  Tennessee General Assembly, Actions on Senate Joint Resolution 80, capitol.tn.gov, https://bit.ly/3rLAgyk.

[41]  Tennessee General Assembly, Senate Joint Resolution 80, capitol.tn.gov https://bit.ly/3F9Yfu3; Tennessee Senate, Floor Session at 1:02:40–1:11:07, capitol.tn.gov (March 15, 2021), https://bit.ly/3PQP6LX; Tennessee House of Representatives, Floor Session at 3:01:50–3:07:50, capitol.tn.gov (May 4, 2021), https://bit.ly/45obXUT.

to advance past the pleading stage. Regardless, there are many permissible reasons for rejecting map proposals—most notably, the plans' risk of harming the political interests of the majority party.

Taken at face value, Plaintiffs' allegations regarding "[t]he specific sequence of events," the "departures from ordinary procedure," and the "legislative history" of the challenged redistricting are just as "consistent with a time-pressed legislature seeking partisan advantage" as with racial motivations. *Abbott*, 601 F. Supp. 3d at 176. Plaintiffs have not stated a plausible discrimination claim.

## IV. Governor Lee Should Be Dismissed From This Action.

As in other redistricting cases, Plaintiffs sued the Governor even though he has no ongoing connection to the challenged maps and cannot remedy the alleged injuries. Plaintiffs in a similar lawsuit against South Carolina likewise named the Governor as a defendant—only to later drop him from the suit rather than defend that choice. Br. for Governor McMaster as Amicus Curiae 9–23, *Alexander v. S.C. State Conf. of the NAACP*, No. 22-807 (U.S. July 14, 2023), 2023 WL 4625529. Whatever Plaintiffs' reason for initially naming Governor Lee as a defendant, he is not subject to suit in this action.

### A. Sovereign immunity bars Plaintiffs from seeking relief against Governor Lee.

Sovereign immunity generally protects state officials like the Governor from being sued without their consent. Nor does the *Ex Parte Young* exception to that rule apply here, because Governor Lee does not administer elections or enforce the challenged maps. He should be dismissed.

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office," *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)—*i.e.*, "the State itself," *Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1046 (6th Cir. 2015). And under the principles of sovereign immunity enshrined in the Eleventh Amendment, a State is not "amenable to the suit of an individual without its consent." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996) (quoting *Hans v. Louisiana*, 134 U.S. 1, 13 (1890)). The Supreme Court created a "narrow exception" to that rule in *Ex parte Young*, 209 U.S. 123 (1908), allowing suit to enjoin a state official "from

enforcing state laws that are contrary to federal law," *Whole Woman's Health v. Jackson*, 595 U.S. 30, 39 (2021). But "*Young* does not reach state officials who lack a 'special relation to the particular statute' and '[are] not expressly directed to see to its enforcement.'" *Russell*, 784 F.3d at 1047 (quotation omitted).

Governor Lee is not a proper defendant because he does not administer or enforce the allegedly unconstitutional maps. Plaintiffs allege that the Secretary of State (not the Governor) is "Tennessee's Chief Election Officer." Dkt. 1 ¶ 47. And the Secretary of State (not the Governor) appoints the coordinator of elections. *Id.*; *see* Tenn. Code Ann. § 2-11-201(a). "The coordinator of elections" in turn serves as "the chief administrative election officer of the state." *Id.* § 2-11-201(b). As Plaintiffs agree, the coordinator of elections "generally supervis[es] all elections" and "[a]uthoritatively interpret[s] the election laws for all persons administering them." Dkt. 1 ¶ 48 (quoting Tenn. Code Ann. § 2-11-202(a)(1), (4)). The Complaint can thus allege nothing about the Governor's involvement in this case and his connection to the Act's enforcement—much less that the Governor has been "expressly directed" to enforce the maps against Plaintiffs. *Russell*, 784 F.3d at 1047.

Plaintiffs cite Governor Lee's general responsibility "for the enforcement of all enacted laws." Dkt. 1 ¶ 46 (citing Tenn. Const. Art. III, §§ 1, 11). But the "[g]eneral authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." *Children's Healthcare Is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1416 (6th Cir. 1996).[42] As courts

---

[42] True, the Sixth Circuit has sometimes allowed suits against governors. *See, e.g.*, *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475 n.16 (6th Cir. 2008); *Lawson v. Shelby County*, 211 F.3d 331, 335 (6th Cir. 2000). But those cases did not—and *cannot*, consistent with earlier Sixth Circuit precedent—create the rule that generalized executive power is always enough to render the Governor a proper defendant under *Ex Parte Young*. *See Children's Healthcare*, 92 F.3d at 1416. Though such a "general" theory "would be a very convenient way for obtaining a speedy judicial determination of questions of constitutional law," the Supreme Court has rejected this approach as an affront to sovereign immunity. *Ex Parte Young*, 209 U.S. at 157 (quoting *Fitts v. McGhee*, 172 U.S. 516, 530 (1899)).

recognize, that "a governor is under a general duty to enforce state laws does not make him a proper defendant in every action attacking the constitutionality of a state statute." *Id.* (quotation omitted). The Panel should join the consensus that governors are immune from redistricting suits because they lack sufficient enforcement authority. *See, e.g.*, *Simpson v. Hutchinson*, 636 F. Supp. 3d 951, 961–62 (E.D. Ark. 2022) (three-judge panel); *Common Cause Florida v. DeSantis*, 2022 WL 19978293, at *2–4 (N.D. Fla. Nov. 8, 2022) (three-judge panel) (per curiam); *see also Tex. Democratic Party v. Abbott*, 978 F.3d 168, 180 (5th Cir. 2020) ("connection between the Governor and enforcement of the challenged [voting] provision [was] insufficient" for *Ex parte Young* to apply).

The Sixth Circuit's holding in *Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656 (6th Cir. 1982), is not to the contrary. Plaintiffs often cite that case to argue the Governor is a proper defendant when the litigation involves a substantial public interest. *Id.* at 665 n.5. But unlike in *Allied Artists*, granting Governor Lee immunity would not bar Plaintiffs from seeking relief against remaining defendants. *See LensCrafters, Inc. v. Sundquist*, 184 F. Supp. 2d 753, 758–59 (M.D. Tenn. 2002) (distinguishing *Allied Artists* on this basis). In any event, the Supreme Court's decision in *Whole Woman's Health* confirms that an *Ex parte Young* defendant must possess clear enforcement authority. *See* 595 U.S. at 43–44. To the extent *Allied Artists* conflicts with this instruction, it is no longer good law. *See Farhoud v. Brown*, 2022 WL 326092, at *4 (D. Or. Feb. 3, 2022) (*Whole Woman's Health* "undermines" *Allied Artists*).

## B. Plaintiffs lack standing to sue Governor Lee.

Plaintiffs likewise lack standing to sue Governor Lee because he neither caused nor can redress their injuries. Article III grants federal courts power to render judgment on "'Cases' and 'Controversies'" only. *Safety Specialty Ins. v. Genesee Cnty. Bd. of Comm'rs*, 53 F.4th 1014, 1020 (6th Cir. 2022) (quoting U.S. Const. art. III, § 2). Standing is a necessary component of that case-or-controversy requirement. It requires an injury in fact that is caused by the defendant and redressable by the requested relief. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). And because "standing is

not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), Plaintiffs must allege facts showing they have standing to proceed against each named defendant, *see Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1031 (6th Cir. 2022).

The generalized allegations against the Governor do not establish standing.

1. <u>Causation</u>. Plaintiffs cannot show that Governor Lee caused their injuries because he is not responsible for the allegedly unconstitutional districts. For lawsuits brought against the Governor, the Complaint must include "specific, plausible allegations about what the Governor has done, is doing, or might do to injure plaintiffs" to establish standing. *Universal Life Church*, 35 F.4th at 1031. "[G]eneral allegation[s]" about Governor Lee's executive power are not enough. *Id.* Without those "specific" allegations, Plaintiffs cannot "explain[] how the *Governor* caused the[ir] injury." *Id.* at 1031–32. No such allegations exist here. The General Assembly—not the Governor—apportions legislative districts. *See generally* Tenn. Const. art. II, § 4.

Nor can Plaintiffs rely on Governor Lee's role in "sign[ing] the redistricting plan into law" to establish causation. Dkt. 1 ¶ 46. Governor Lee enjoys absolute legislative immunity for signing the redistricting proposal. *See Women's Emergency Network v. Bush*, 323 F.3d 937, 950 (11th Cir. 2003) ("Under the doctrine of absolute legislative immunity, a governor cannot be sued for signing a bill into law."); *cf. Smiley v. Holm*, 285 U.S. 355, 372–73 (1932) (a governor's signing of a bill is a part of the legislative process). So that cannot form the basis for causation.

2. <u>Redressability</u>. Plaintiffs also cannot prove redressability because Governor Lee does not enforce the challenged maps and cannot provide Plaintiffs with the relief they seek. "The redressability prong is not met when a plaintiff seeks relief against a defendant with no power to enforce a challenged statute." *Bronson v. Swensen*, 500 F.3d 1099, 1111 (10th Cir. 2007). An injury is redressable if "a judicial decree can provide 'prospective relief' that will 'remove the harm.'" *Doe v. DeWine*, 910 F.3d 842, 850 (6th Cir. 2018) (quoting *Warth v. Seldin*, 422 U.S. 490, 505 (1975)). The "real value of the judicial

pronouncement—what makes it a proper judicial resolution of a 'case or controversy'"—"is in the settling of some dispute *which affects the behavior of the defendant towards the plaintiff*." *Hewitt v. Helms*, 482 U.S. 755, 761 (1987) (alteration in original).

Plaintiffs cannot establish redressability. For starters, the Governor has "no power to enforce" the maps. *Bronson*, 500 F.3d at 1111. That authority resides in other executive officials, including the Secretary of State and the Coordinator of Elections. *See supra* Argument IV.A. Moreover, Plaintiffs have not shown "what a federal court could order the Governor to do or refrain from doing to give them relief." *Universal Life Church*, 35 F.4th at 1031; *see also R.K. by and through J.K. v. Lee*, 53 F.4th 995, 1000–01 (6th Cir. 2022) (no standing to pursue claims against governor). Plaintiffs request an injunction forbidding defendants from "enforcing or giving effect to" the challenged districts and requiring the development of "valid plans." Dkt. 1, at 48. Governor Lee does not "giv[e] effect to" the challenged maps nor can he develop new ones. Because Governor Lee "has no power to provide any of the relief requested," *Lowery v. Governor of Georgia*, 506 F. App'x 885, 886 (11th Cir. 2013) (per curiam) (dismissing the governor from a redistricting lawsuit), Plaintiffs lack standing.

## CONCLUSION

For these reasons, the motion to dismiss should be granted. The Complaint is barred by the laches doctrine, fails to state a claim, and cannot proceed against Governor Lee as a defendant.

Respectfully submitted,

JONATHAN SKRMETTI
Attorney General and Reporter

ADAM K. MORTARA (BPR# 40089)
Lawfair LLC
40 Burton Hills Blvd., Suite 200
Nashville, TN 37215
(773) 750-7154
mortara@lawfairllc.com

/s/   Philip Hammersley
PHILIP HAMMERSLEY (BPR# 041111)
    Assistant Solicitor General
WHITNEY D. HERMANDORFER (BPR# 041054)
    Director of Strategic Litigation
MIRANDA H. JONES (BPR# 036070)
    Senior Assistant Attorney General
RYAN NICOLE HENRY (BPR# 40028)
    Assistant Attorney General
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 532-2935
philip.hammersley@ag.tn.gov
whitney.hermandorfer@ag.tn.gov
miranda.jones@ag.tn.gov
ryan.henry@ag.tn.gov

**Counsel for Defendants**

## CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2023, the undersigned filed the foregoing document via this Court's electronic filing system, which sent notice of such filing to the following counsel of record:

| COUNSEL OF RECORD | PARTY REPRESENTED |
|---|---|
| Phillip F. Cramer<br>Sperling & Slater<br>150 3rd Avenue South, Suite 1100<br>Nashville, TN 37201<br>Tel.: 312-224-1512<br>pcramer@sperling-law.com<br><br>Jon Greenbaum<br>Ezra D. Rosenberg*<br>Pooja Chaudhuri*<br>Lawyers' Committee for Civil Rights Under Law<br>1500 K Street NW, Suite 900<br>Washington, DC 20005<br>Tel.: 202-662-8600<br>jgreenbaum@lawyerscommittee.org<br>erosenberg@lawyerscommittee.org<br>pchaudhuri@lawyerscommittee.org<br><br>Jeffrey Loperfido*<br>Mitchell D. Brown*<br>Southern Coalition for Social Justice<br>1415 West Highway 54, Suite 101<br>Durham, NC 27707<br>Tel.: 919-323-3380<br>jeffloperfido@scsj.org<br>mitchellbrown@scsj.org<br><br>George E. Mastoris*<br>Michelle D. Tuma*<br>Winston & Strawn LLP<br>200 Park Avenue<br>New York, NY 10166<br>Tel.: 212-294-6700<br>gmastoris@winston.com<br>mtuma@winston.com<br>***Counsel for Plaintiffs*** | Plaintiffs Tennessee State Conference of the NAACP, League of Women Voters of Tennessee, The Equity Alliance, Memphis A. Philip Randolph Institute, African American Clergy Collective of Tennessee, Judy Cummings, Brenda Gilmore, Ophelia Doe, Freda Player, and Ruby Powell-Dennis |

| | |
|---|---|
| Adam K. Mortara<br>Lawfair LLC<br>40 Burton Hills Blvd., Suite 200<br>Nashville, TN 37215<br>(773) 750-7154<br>mortara@lawfairllc.com<br><br>Whitney D. Hermandorfer<br>   Director of Strategic Litigation<br>Miranda H. Jones<br>   Senior Assistant Attorney General<br>Ryan Nicole Henry<br>   Assistant Attorney General<br>Philip Hammersley<br>   Assistant Solicitor General<br>Office of the Tennessee Attorney General<br>P.O. Box 20207<br>Nashville, Tennessee 37202<br>(615) 532-2935<br>whitney.hermandorfer@ag.tn.gov<br>miranda.jones@ag.tn.gov<br>ryan.henry@ag.tn.gov<br>philip.hammersley@ag.tn.gov<br>***Counsel for Defendants*** | Defendants William B. Lee, in his official capacity as Governor of the State of Tennessee, Tre Hargett, in his official capacity as Secretary of State of the State of Tennessee, Mark Goins, in his official capacity as Coordinator of Elections for the State of Tennessee, the State Election Commission, and Donna Barrett, Judy Blackburn, Jimmy Eldridge, Mike McDonald, Secondra Meadows, Bennie Smith and Kent Younce, in their official capacities as members of the State Election Commission |

/s/    *Philip Hammersley*
PHILIP HAMMERSLEY (BPR# 041111)
Assistant Solicitor General
*Counsel for Defendants*